Charles S. FOLTZ, et al., Plaintiffs,

v.

U.S. NEWS & WORLD REPORT, INC.,
et al., Defendants.

Civ. A. No. 84–0447.

United States District Court,
District of Columbia.

Jan. 15, 1986.

1144

1146

Alan Raywid, John D. Seiver, Susan P. Baxter, Cole, Raywid & Braverman, Washington, D.C., for plaintiffs: (Foltz, Handleman, Price, Williamson).

Richard J. Leighton, Avis Black, Washington, D.C., for Save the Fund.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Thomas J. Catliota, Washington, D.C., for defendants: (U.S. News, Madana Realty).

Lawrence Latto, William Galeota, Julie Melamud, Shea & Gardner, Washington, D.C., for Profit-Sharing Plan & Current Plan Committee.

Richard J. Wertheimer, Hadrian Katz, Edward Wolf, Washington, D.C., for defendants: (Directors).

Willis B. Snell, Willard K. Tom, Steuart H. Tomsen, Washington, D.C., for defendant: (The American Appraisal Co.).

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

This class action suit is brought against U.S. News & World Report magazine ("U.S. News" or "Company") by a group of its former employees who terminated their employment during the period from 1974 through 1981.[1] The litigation was triggered by the sale, in October 1984, of U.S. News to real estate magnate and developer Mortimer Zuckerman for approximately $176 million. Plaintiffs complain that the stock of the Company, which constituted the corpus of the employee profit-sharing plan, was wrongfully and grossly undervalued for a number of years prior to the sale and that employees who retired during the designated class period are owed unpaid benefits and entitled to damages under various legal theories.

The parties have completed substantial pretrial discovery and have filed cross motions for summary judgment. The issues presented are set forth, *infra* at 1148–1149. This Memorandum Opinion provides the Court's ruling on those motions.

### BACKGROUND

In 1962, U.S. News was reorganized to provide, consonant with the wishes of David Lawrence, the magazine's founder and owner, that employees of the Company would share in its ownership and profits. Accordingly, Articles of Incorporation authorized the issuance of Class A and common stock, each having full and equal voting rights. The employees could not sell or transfer their interests during their employment and upon termination were required to offer them to the Company at values established through mutual agreement or by outside appraisers.

The Profit-Sharing Plan of U.S. News ("Plan"), a non-contributory plan, was in existence when the Articles were adopted. By 1967, the Plan had acquired 50,000 shares of Class A stock, which it held throughout the class period. In addition, U.S. News was obligated to make contributions to the Plan. Over the years, the Plan acquired a modest portfolio of investment securities, which was of limited value as compared with the Class A stock. The Plan was managed by a Profit-Sharing Committee ("Plan Committee"), appointed by the Company's Board of Directors, while its accounts were maintained by a trustee.[2] Each plan participant was allotted an account balance, based upon his salary and term of service. Upon retirement, the participant received payment, either lump sum or periodic, as determined by the appraised value of the Class A stock held by the Plan.

Beginning in 1963, a stock bonus plan was adopted which allotted to certain employees common stock known as bonus or anniversary stock. The employee could not sell or encumber the stock, absent Company approval. Upon retirement or termination, each employee was, at the option of U.S. News, required to sell back his shares of stock to the Company. Payments of bonus stock were made every five years, beginning with the fifth year after an employee joined the magazine. The number of shares allotted an employee was based upon his salary and length of service.

Together with most of the common stock, the 50,000 shares of Class A stock held by the Plan were placed in a voting trust. This arrangement gave the voting trustees effective control over the management of U.S. News, and placed them in a position where they could elect themselves to the Board and then appoint themselves to the Plan Committee. While Board members were not entitled to participate in the stock bonus plan, beginning in 1968, the Board did award stock to its directors.

---

1. For a fuller treatment of the background of this litigation, see this Court's pre- and post-remand opinions concerned with plaintiffs' Motion for Preliminary Injunction, 608 F.Supp. 1332 and 613 F.Supp. 634 (D.D.C.1985), as well as the Circuit Court opinion remanding the case for further proceedings, 760 F.2d 1300 (D.C.Cir. 1985).

2. Since 1979, Mercantile-Safe Deposit & Trust Company.

This stock, carried on the corporate books as debt, represented a right to deferred compensation only, with no voting privileges. The plaintiffs have labeled the shares "phantom stock."

As noted, the amount of benefits that each employee received upon separation hinged upon the value of the Company's stock. Since there was no market for the stock, U.S. News hired an independent appraiser, defendant American Appraisal Associates ("American Appraisal"), to arrive at a fair value for the shares. Plaintiffs challenge the validity of those appraisals, because, as they allege, U.S. News and American Appraisal worked together to eliminate from the calculation of the Company's net worth, the value of several parcels of undeveloped real estate held by U.S. News, land which, upon sale of the magazine, added considerably to the price paid per share. The real estate was held by Madana Realty Company, a subsidiary of U.S. News. Plaintiffs also allege that American Appraisal improperly valued the stock in other ways, which are discussed in greater detail, *infra* at 1170–1173.

The original complaint was filed in early 1984. Since then it has undergone several amendments. At this time the defendants are U.S. News and eight former members of its Board of Directors, the Profit-Sharing Plan, American Appraisal, and the Madana Realty Company. To redress what wrongs they feel they suffered at the hands of those defendants, plaintiffs press a variety of statutory and common-law claims. In Count I of the recently filed Fifth Amended Class Action Complaint,[3] U.S. News, the former directors, and American Appraisal are charged with violations of the Securities Exchange Act of 1934. Count II asserts claims for benefits and damages against U.S. News, the director-defendants, American Appraisal, and the Profit-Sharing Plan under various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). In Counts III, IV, V and VI, U.S. News, the director-defendants, and American Appraisal are sued variously for common law and constructive fraud, breach of fiduciary duty, unjust enrichment, negligence and negligent misrepresentation.[4]

Plaintiffs have moved for partial summary judgment against all the defendants on the ERISA claims. The defendants, in turn, have moved for summary judgment on all counts, pleading that the relevant statutes of limitation bar most, if not all, the claims. In addition, U.S. News, the director-defendants, and American Appraisal press a variety of theories according to which they argue that each of the statutory and common-law claims are fatally flawed as a matter of law.

Subsequent to the filing of their Fifth Amended Complaint, plaintiffs renewed in substance their earlier filed motion for partial summary judgment. U.S. News, the director-defendants and American Appraisal also filed additional motions for summary judgment directed to the new claims raised by the Fifth Amended Complaint.

This Memorandum Opinion will discuss the issues presented by the parties' several motions in the following order:

---

**3.** While leave to file a fifth amended complaint was granted subsequent to the briefing of the first round of dispositive motions, *see* Order of October 4, 1985, the parties have addressed for the most part whatever additional issues were presented in that complaint, save for those issues raised by the new claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. That claim was stricken from that complaint as it was allowed to be filed. In addition, plaintiffs have withdrawn their antitrust claim, after realizing that it was without merit. What new claims the amended complaint has raised have been treated in motions for summary judgment of American Appraisal, U.S. News and the director-defendants, filed on November 27 and 29, 1985. Those motions are considered in this Memorandum Opinion.

**4.** Count VII of the amended complaint pressed ERISA claims against Mercantile and current members of the Plan Committee, charging them with having breached fiduciary duties owed plaintiffs by approving a disbursement, in July 1985, of a portion of those Plan assets not held back by the preliminary injunction issued on June 14, 1985. Those claims were dismissed without prejudice. *See* Order of November 26, 1985, 623 F.Supp. 60.

Part I, pp. 7 to 26, discusses the motions of the defendants challenging the complaint on grounds that it was untimely filed and barred by the relevant statutes of limitations.

In part II, pp. 26 to 42, the Court deals with defendants' motion to dismiss plaintiffs' securities law claims.

Parts III and IV, pp. 43 to 71, are concerned with the parties' pleadings and representations on the ERISA claims. Part III, pp. 43 to 57 considers defendants' challenge to the plaintiffs' claims under ERISA. Part IV, pp. 57 to 70, addresses plaintiffs' motion for partial summary judgment on those claims.

Part V, pp. 70 to 75, discusses ERISA's preemptive effect on plaintiffs' common-law claims and Section VI, pp. 75–84, is concerned with whether the defendants are entitled to summary judgment on those claims.

## ANALYSIS

At this stage in the pretrial proceedings, it is not the Court's task to attempt to resolve the factual issues raised, *Rodway v. United States Dep't of Agriculture*, 482 F.2d 722, 727 (D.C.Cir.1973), but merely to determine whether there are indeed material factual issues that need be presented more fully to the ultimate trier of fact. While discovery in this case fills volumes, the Court may not, tempting as it may be to do so, remove the resolution of disputed issues of fact from the fact-finder, in an effort to whittle down the litigation as originally framed.

## PART I

### DO THE RELEVANT STATUTES OF LIMITATION BAR PLAINTIFFS' CLAIMS?

A threshold issue presented at this juncture is whether the applicable statutes of

limitation bar any or all of plaintiffs' claims [5] relating to the undervaluation. All of the defendants seize upon this defense. As plaintiffs must concede, the applicable limitations periods would work to bar most or all of their claims unless they have been the victims of fraudulent concealment and were not otherwise on notice of their claims prior to filing suit. Yet because the questions of concealment and notice raise factual issues that vary as to each group of defendants, analysis of the limitations bar must consider the participation of each of the various defendants. Accordingly, the role of U.S. News, its directors and the Profit-Sharing Plan will first be addressed, followed by a consideration of the conduct of American Appraisal.

### A.

### AS TO U.S. NEWS, THE DIRECTORS, AND THE PROFIT–SHARING PLAN

The Court has already visited the question concerning the extent to which the principals of the Company, its Profit-Sharing Plan, and the other centers of corporate control enjoyed overlapping jurisdictions. *See* 608 F.Supp. at 1336, 1344. Suffice it to say at this point that there is ample evidence in the record to support a finding that there are disputed issues of fact as to whether a pattern of fraudulent concealment engaged in by the directors may be imputed both to the magazine as a corporate entity and to the Plan. For the present discussion, then, it will be assumed that if the record reveals the presence of factual issues suggesting fraudulent concealment by the magazine's principals, the statute of limitations will be tolled as to U.S. News and the Plan, as well.

### 1. Federal Law Claims

■ Before analyzing the factual record, it might be well to set out briefly what is

---

**5.** The applicable limitations period for the ERISA claims is three or six years, *see* discussion, *infra* at 1156; for the securities claims, two years, *see Wachovia Bank & Trust Co. v. Nat'l Student Marketing Corp.*, 650 F.2d 342, 346–48 (D.C.Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981) (D.C. Code Ann. § 2–2413(e) applies to cases filed after 1977); and for the common-law claims, three years, *see* D.C.Code Ann. § 12–301(7), (8) (Michie 1981 & Supp.1985).

involved in a claim of fraudulent concealment.[6] In a recent ruling on the doctrine, Judge Edwards of our Circuit Court spoke of two situations in which fraudulent concealment may toll the statute of limitations. The first is that in which acts of concealment in addition to the primary wrong are necessary to effect concealment. *Hobson v. Wilson,* 737 F.2d 1, 33 (D.C.Cir.1984). The second is that in which the concealment is implicit in the nature of the wrong. *Id.* In a case in which the defendants have actively concealed the wrong, the statute is tolled until the wrong is actually discovered. *Id.* at 34 n. 103 (citing *Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir.1975)). In such a situation, the plaintiff need not exercise due diligence to avail himself of the doctrine of equitable tolling. In the case of "self-concealing" wrongs, the court stresses that due diligence is essential. *Id.* (citing *Wachovia Bank & Trust Co. v. Nat'l Student Marketing Corp.,* 650 F.2d 342, 349 (D.C.Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981)).

It is not seriously alleged that any of the defendants engaged in any course of conduct—subsequent to the perpetration of the primary wrongs—designed to conceal those wrongs. The question then is whether the wrongs were indeed "self-concealing," and not merely such as to innocently evade plaintiffs' notice. Yet the doctrine of fraudulent concealment has no applicability at all if the plaintiff was on notice of the wrong complained of. *Hobson,* 737 F.2d at 35.

█ Notice means one of two things. First, a plaintiff is on notice of a particular cause of action when he is apprised of facts unique to that cause of action. Second, a plaintiff will be considered on inquiry notice if he has not "exercise[d] due diligence

in conducting [an] inquiry" upon knowledge of facts short of those that would give rise to a cause of action. *Id.* at 35 n. 107. In other words, while a prospective plaintiff does not have to file suit on a hunch, *id.* at 39, once his suspicions have been aroused, once he has perceived some degree of injury, he is put under a duty to exercise due diligence to inquire further as to a possible claim.

As a final note before considering the factual record, it is recognized that a court should be wary of granting summary judgment where, as here, issues of fraud, notice, intent, and the like are present. *See generally* 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 2730 at 246–55 (1983). It is also recognized that to sustain their burden, defendants must show that there is no genuine issue of material fact in dispute and that they are entitled to judgment as a matter of law, *Perry v. Block,* 684 F.2d 121, 126 (D.C.Cir. 1982), even when the facts, and all inferences to be drawn therefrom, are seen in the light most favorable to the nonmoving party. *Weisberg v. United States Dep't of Justice,* 627 F.2d 365, 368 (D.C.Cir.1980).

█ With this in mind, two undisputed facts are noted at the outset. The first is that on each Voting Trust Certificate,[7] was a written notice advising the holder of his right to demand a second appraisal of the U.S. News stock. Second, under Delaware corporation law the plaintiffs had access to the appraisal reports prepared by American Appraisal and filed with agencies of that state. Both of these facts go to the issue of whether plaintiffs were diligent in their efforts to uncover matters surrounding defendants' alleged wrong-doing. But before assessing the plaintiffs' diligence, it is necessary first to determine whether there are

---

**6.** The analysis of a fraudulent concealment claim, pressed in an action governed by federal law, must follow the law as developed by federal courts. *Hobson v. Wilson,* 737 F.2d 1, 33 & n. 100 (D.C.Cir.1984). Claims predicated upon District of Columbia law, however, must follow local tolling precedents. *Richards v. Mileski,* 662 F.2d 65, 70 (D.C.Cir.1981), even when filed in federal court.

**7.** Such a Certificate was issued to holders of bonus stock. A sample Certificate was identified as Plaintiffs' Exhibit 315 in Support of Motion for Preliminary Injunction. [All such exhibits will hereinafter be cited as "PX ___."]

undisputed facts indicating either that plaintiffs were on actual notice of the alleged wrongful acts or at least were on inquiry notice.

While plaintiffs contend that they did not know of facts surrounding any wrongful undervaluation of the U.S. News stock until May 1983 (when its value rose dramatically) or December 1983 (when it was announced that the magazine was to be sold), defendants argue that plaintiffs had long been on notice of the valuation techniques alleged to have been most wrongful—the minority-interest valuation of the stock and the low value placed on the real estate. Defendants also maintain that the appraisal reports, which plaintiffs claim were withheld and which contained essential information, were not critical to bringing the suit, since the plaintiffs did not have such reports or information even when they filed their complaint. What defendants overlook, however, is that prior to 1983, plaintiffs could only have garnered information that might have put them on notice of their claims from the reports, or from scattered remarks made by directors of the Company. The question that remains, then, is whether the plaintiffs learned or could have learned anything during the class period that would have put them on actual or inquiry notice as to any potential claim.

Defendants adduce the transcript of the April 8, 1974, annual shareholder luncheon, PX 37, as a prime example of the kind of notice plaintiffs received regarding the valuation of U.S. News' stock. At this luncheon, Chairman John Sweet described the way in which American Appraisal valued U.S. News' stock, comparing the stock's earnings and dividend-paying capacities to those of publicly-traded companies in similar businesses.[8] Defendants argue that this disclosure put plaintiffs on notice that U.S. News' stock was being valued according to a minority interest, because it was being compared to that of companies whose stock necessarily was being valued (by the market) on a minority-interest basis. Mr.

Sweet also mentioned at the time that the real estate was carried on the books at approximately one-third of its true value. PX 37, Q & A at 12. In response, plaintiffs contend that this was totally inadequate and insufficient: that (1) they cannot be charged with knowing the significance of comparisons between U.S. News' stock with that of publicly-traded companies; that (2) in any case, Sweet's remarks could not be interpreted to mean that the real estate was valued by American Appraisal at one-third of value, because American Appraisal issued no reports for the years 1971 through 1973 and because Sweet had no personal knowledge of the valuation techniques used by American Appraisal; and that (3) in those and subsequent years, American Appraisal was not kept informed of U.S. News' real estate development plans.

To be sure, Mr. Sweet's personal knowledge of the appraisal methods utilized by American Appraisal is irrelevant to whether plaintiffs would have been put on notice of a potential claim if they had heard and absorbed what was said at the 1974 shareholder luncheon. Similarly, what American Appraisal knew with respect to U.S. News' nascent plans for developing its real estate holdings says nothing about what plaintiffs knew. The issue is, rather, whether plaintiffs understood that American Appraisal was not using the true value of the real estate in valuing the U.S. News stock.

Taking a somewhat broader view, it seems inappropriate on a motion for summary judgment to impute notice, on the basis of a few remarks made at a shareholder luncheon. What percentage of employees attended the luncheons is far from clear from the record; however, it is clear that attendance was limited to holders of anniversary stock, employees who had worked at the magazine for at least five years. It was not open to employees by virtue of their participation in the Plan. At least one deposed class representative testified that he attended only some of the

---

**8.** These remarks were made in the course of the question-and-answer period ("Q & A") traditionally held following the Chairman's formal report. PX 37, Q & A at 5.

luncheons. Theobald Deposition at 53–57. He further testified that he did not review prepared transcripts of those meetings, because he felt discouraged from doing so by the conditions under which they were to be viewed.[9] Given such testimony, the Court is not prepared to hold that what defendants adduce as clear, undisputed evidence of notice stands out from the rest of the record with such clarity as to sweep aside other evidence to the contrary.

What plaintiffs knew about the relationship between the valuation of the Company's stock and the appreciation of its real estate is hardly illuminated by the fragmented deposition testimony cited by defendants. At one point in his August 10, 1984 deposition, class-plaintiff Edward Castens testified that he was aware of a dramatic increase in the value of the real estate holdings, and that because of this appreciation, he believed he was not paid adequate retirement benefits. *Id.* at 18–19. However, it is not clear from context whether Mr. Castens is testifying that now, looking back upon the historic increase in land values in the area, he believes he was underpaid, or whether he knew then that the appreciation in the real estate was not reflected in the valuations performed by American Appraisal. The only seemingly clear testimony that defendants adduce to impute notice comes from plaintiff Richard Theobald:

> Q. [Y]ou had a question as to whether the value of the stock accurately reflected the value of the real estate?
> A. I *did.*
> Q. And you had that question when, in the '60s and early '70s?
> A. Yes, all those years when things [developments in the area] were happening.

Theobald Deposition, August 10, 1984, at 41. Yet in the same deposition, Mr. Theobald testified that he did not know how the real estate was in fact valued and, hence, could not really know whether the U.S. News stock was undervalued as a result of any misappraisal. *Id.* at 45. It is precisely this kind of record that prompts caution in granting summary judgment when issues of notice are raised.

Of course, ignorance of a potential claim is not enough to toll the Statute. Rather, plaintiffs' ignorance must have been caused in some way by fraudulent activity on the part of defendants.

While not clearly instances of concealment, information given out by U.S. News can, at least in certain circumstances, be said to fit plaintiff's characterization of it as "disinformation." One example of an ambiguous or misleading disclosure occurred at the 1981 annual shareholder luncheon, PX 42, when an employee asked whether the stock would be revalued once development was on track. Chairman Sweet answered that it would, PX 42, Q & A at 49–50, and in so doing may have given the impression that the stock value generally tracked the progression of U.S. News' real estate development plans. Again in a 1980 memorandum to employees, Sweet mentioned the favorable impact that development would likely have on the employees' Plan accounts, without revealing that a study conducted by the law firm of Arnold & Porter valued the real estate holdings at $37.5 million, PX 82 at 5, as opposed to American Appraisal's figure of $4.6 million, PX 20 at 13; that a development contract was soon to be closed; and finally, that certain downward adjustments were made by American Appraisal to further lower the value attributed to the property.

Other instances of apparent misconduct involved the 1978 and 1980 year-end appraisals, PX 17, 20. Plaintiffs allege in connection with the 1978 appraisal that a vice president of an American Appraisal division telephoned U.S. News in March of 1979, giving a per share value estimate prior to the performance of an appraisal for that year. A letter of April 13, 1979 confirms that conversation. That estimated value was then apparently given to the appraiser who later undertook the valua-

---

9. According to Mr. Theobald, Deposition at 56–57, employees could not sign out the transcripts, but had to read them through at a designated location.

tion of the U.S. News stock.[10] The worksheets of the appraiser indicate, at that least upon initial examination, he worked backwards from the estimated value to arrive at an "appraised" value.[11] When questioned about this procedure, the appraiser admitted that he worked backwards in this fashion, Marshall Deposition, August 7, 1984, at 440, and further testified that a figure that he arrived at using the normal appraisal methodology was not used, because the prior estimate had already been released. *Id.* at 191–92.

The 1980 year-end appraisal raises similar questions. Notes taken by the appraiser during the course of an interview of U.S. News officials in connection with the appraisal seem to support plaintiffs' allegation that U.S. News and American Appraisal fixed a range within which any valuation should fall.[12] While it is unclear how awareness of this "negotiated" figure affected the subsequent appraisal, *see* Marshall Deposition at 585, such a collaboration between the defendants raises serious doubts as to the independence enjoyed by American Appraisal and the care with which it conducted the valuations of U.S. News' stock. While the conduct of the two goes primarily to the merits of plaintiffs' claims, such conduct also speaks to the issue of concealment. If the appraisals were improperly conducted and if such impropriety was not apparent from the face of the appraisal reports, the misappraisals would constitute self-concealing wrongs.[13] *See Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951, 957–58 (D.C.Cir.1985); *Hobson,* 737 F.2d at 41.

Finally, to support their allegations that the Company followed a policy of limited disclosure of information to its employees, plaintiffs adduce a December 10, 1980 memorandum written by Chairman Sweet to certain management personnel, PX 319. The memorandum was circulated as a cover sheet for the December 10, 1980 memorandum sent to employees notifying them that the Company's real estate development plans might, at some time in the future, favorably affect their retirement benefits. The cover memorandum instructs the magazine's managers not to discuss further with the employees any relationship between U.S. News' real estate development plans and the valuation of its stock. While not dispositive, the memorandum certainly suggests behavior and an attitude on the part of senior U.S. News management consistent with fraudulent concealment.

Still, the inquiry is not quite over. To the extent that plaintiffs complain of self-concealing wrongs, they were bound to exercise due diligence in trying to discover their causes of action as soon as was practicable. While most of the plaintiffs have been deposed as saying that they did not ask to see an appraisal report nor sought reappraisal, at least one plaintiff testified that he "likely" asked to see an appraisal report during the class period. Theobald Deposition at 60–61. From plaintiffs' failure to ask for the reports, one might infer, not that plaintiffs were inattentive, but either (1) that plaintiffs were not on notice of any possible wrong-doing,[14] or (2) that they

**10.** The appraiser's worksheet bears the note: "John Hossack [the vice president in question] gave this a value of $105.00 per share." PX 66.

**11.** *See* PX 71.

**12.** The note in question reads: "Ray [Naimoli, U.S. News vice president and treasurer] mentioned he [and the] auditors had agreed to procede [sic] [with the] audit using [$] 150–170 [per] share." PX 96 at 108480 (interview notes, March 6, 1981). *See also* Marshall Deposition at 584.

**13.** Such would be the case quite apart from whether or not the appraisal reports were dis-

closed. It is unclear whether U.S. News did in fact make the reports available, *see* discussion, *infra,* which nondisclosure would constitute concealment even if the wrongs were apparent from the face of the reports.

**14.** If the plaintiffs had no inkling that their retirement benefits were being undervalued, then no duty to inquire about the appraisal reports or to seek reappraisal would arise. *See, e.g., Corley v. Hecht Co.,* 530 F.Supp. 1155, 1159 (D.D.C.1982). When no reason exists to question an expert opinion, such as American Appraisal's, rendered to an employee benefit plan, the plan beneficiaries are entitled to rely upon

believed that a request for such information would be unavailing.[15]

In view of the conflicting evidence in the record, the Court is compelled to find that there are material issues of fact as to whether plaintiffs exercised the requisite diligence.

## 2. Common-Law Claims

Whether the common-law claims asserted by plaintiffs are time-barred is a question that must be resolved according to District of Columbia law. Preliminarily, those claims must be segregated into two classes: those predicated upon negligence and those presupposing intentional conduct. In the first class are the claims for negligence, negligent misrepresentation, and "constructive" fraud;[16] in the second, claims for unjust enrichment,[17] breach of fiduciary duty,[18] and fraud.

Those claims falling into the second category pose no special problem. While to be charged under District of Columbia law with fraudulent concealment a defendant must have engaged in some affirmative act to perfect that concealment, "any statement, word or act which tends to suppress the truth raises the suppression to that level." *William J. Davis, Inc. v. Young,* 412 A.2d 1187, 1192 (D.C.App.1980) (cita-

tions omitted). A pattern of conduct that would "lull the plaintiff into inaction" would be sufficient to constitute such concealment. *Id.* at 1192 & n. 15. A pattern of such conduct may very well have prevented the plaintiffs in this case from filing suit earlier; as the Court's discussion of equitable tolling as to the federal claims should make clear, the record is simply not unequivocal one way or the other.

Those claims sounding in negligence appear at first to fall outside the doctrine of equitable tolling. It seems paradoxical to argue that an actor accused of negligent— inattentive—conduct could have engaged in that conduct in such a way as to *intentionally* conceal[19] evidence of his negligence. Yet with regard to their negligence claims, plaintiffs may avail themselves of the "discovery" doctrine. That doctrine comes into play in situations in which plaintiff has relied upon the representations or expertise of one more knowledgeable and in which the plaintiff's injury was such that it was not readily discernible.[20] *See Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192, 1201– 02 (D.C.App.1984). *Ehrenhaft* applied the doctrine to a case involving architectural malpractice; other cases have applied it to legal malpractice. *See, e.g., Byers v. Burleson,* 713 F.2d 856, 860 (D.C.Cir.1983)

that opinion. *Buccino v. Continental Assur. Co.,* 578 F.Supp. 1518, 1524 (S.D.N.Y.1983). Plaintiffs have generally asserted that they believed U.S. News was handling the stock valuation competently. *See, e.g.,* Castens Deposition at 19, 35; Theobald Deposition at 20–21, 38.

**15.** Plaintiff Theobald stated that he requested reports before the class period, but was told that they were unavailable. Deposition at 16–17. Moreover, Thelma Olson, the individual charged with keeping the reports testified that she thought they were confidential. Olson Deposition, November 9, 1984, at 36.

**16.** Plaintiffs' claim for constructive fraud—"negligence combined with a duty," as they describe it, Fifth Amended Complaint ¶ 87—seems to be no more than a restatement of their negligence claims. Insofar as liability for negligent conduct always presupposes a duty owed the injured party, "negligence combined with a duty" means no more than "negligence."

**17.** While plaintiffs' claim for unjust enrichment seems to rest upon a weak foundation, the Court

is not able at this point to conclude that plaintiffs "would not be entitled to [prevail] under any discernible circumstances." *Semaan v. Mumford,* 335 F.2d 704, 705 n. 2 (D.C.Cir.1964), *quoted in National Ass'n of Gov't Employees v. Campbell,* 593 F.2d 1023, 1027 (D.C.Cir.1978). *See* discussion, *infra* at 1177.

**18.** A breach of the fiduciary duty of loyalty, as opposed to the fiduciary duty of care, would seem to be an intentional wrong.

**19.** After having taken the position that the wrongs allegedly perpetrated by defendants were "self-concealing," plaintiffs would be hard pressed to now maintain that they were concealed through subsequent conduct.

**20.** A potential plaintiff is still required to exercise due diligence; however, that issue has already been addressed in the Court's discussion of whether plaintiffs' federal claims were fraudulently concealed.

(applying District of Columbia law); *Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992, 996 & n. 8 (D.C.App.1978). The instant case certainly raises issues of fact as to whether plaintiffs relied upon the judgments of the U.S. News management. That the resultant injury was latent rather than manifest is also hotly in dispute. In such a situation, summary judgment is not appropriate.

### Conclusion

Given that material issues of fact are raised as to whether U.S. News, the director-defendants, and the Plan, through its principals, engaged in a pattern of fraudulent concealment, and as to whether plaintiffs were on actual or inquiry notice of potential claims and, if on inquiry notice, whether they exercised due diligence in following through on their suspicions, the Court will not grant these defendants summary judgment as to the statute of limitations with respect to any of the claims advanced by plaintiffs. Defendants, of course, are free to renew the issue at an appropriate time during the trial on the merits.

### B.

### AS TO AMERICAN APPRAISAL

#### 1. Federal Law Claims

■ Unlike the other defendants, American Appraisal engaged in conduct not so easily characterized as fraudulent. And if American Appraisal's conduct does not amount to fraudulent concealment, no amount of fraudulent concealment on the part of any other actors will toll the Statute as to that defendant. "The purpose of the doctrine of fraudulent concealment is to prevent a party from profiting from his *own* wrong, so that one who conceals facts to prevent the timely commencement of a lawsuit is estopped from pleading that de-fense." *Greenfield v. Kanwit,* 87 F.R.D. 129, 132 (S.D.N.Y.1980). *Accord Powell v. Radkins,* 506 F.2d 763, 765 n. 5 (5th Cir. 1975), *reh. denied,* 509 F.2d 576, *cert. denied,* 423 U.S. 873, 96 S.Ct. 140, 46 L.Ed.2d 104 (1975); *Cato v. So. Atlantic & Gulf Coast Dist. of Int'l Longshoremen's Ass'n,* 364 F.Supp. 489, 493 (S.D.Tex.1973), *aff'd,* 485 F.2d 583 (5th Cir.1973).

Plaintiffs have maintained throughout—in both their pleadings and oral presentations—that U.S. News and American Appraisal engaged in a conspiracy of unspecified dimensions, as to both time and nature. To be sure, any concealment by U.S. News would also toll the statute as to American Appraisal, if indeed the concealment was effected in furtherance of a conspiracy. *Greenfield,* 87 F.R.D. at 132. While the care and precision with which American Appraisal performed its function may be open to question, the record does not reveal or suggest anything in the nature of a conspiracy between the two save with regard to the 1978 and 1980 appraisals. Accordingly, if the statute is to be tolled as to American Appraisal, it is because of its own acts of concealment.

Except for those years, plaintiffs would be hard pressed to demonstrate that American Appraisal engaged in any acts of concealment. In the first place, it was not that company's responsibility to see that its reports were distributed to the U.S. News employees. Its responsibility was ended when the reports were transmitted to the Board of Directors.[21] More importantly, as conceded by counsel for the class at oral argument, American Appraisal consistently disclosed its appraisal methodology in its reports. Transcript of Motions Hearing of October 16, 1985, at 16.[22] For every year that American Appraisal rendered appraisals, the reports indicated what weight, if any, was being given to the Company's real

---

**21.** Plaintiffs' assertions to the contrary notwithstanding, American Appraisal is not a fiduciary, within the meaning of ERISA, with respect to the magazine's employees. *See* discussion of ERISA claims, *infra.* Hence, American Appraisal was under no special obligation to see that the reports got into the hands of the U.S. News employees.

**22.** Plaintiffs' counsel also stated at another time that the marketability discount was disclosed in the appraisal reports. Transcript of Motions Hearing of October 7, 1985, at 51.

estate holdings and that it was valuing the Company's stock on a minority-interest basis, as well as discounting the stock's value because of its non-marketability.

As indicated previously, the appraisals conducted for the years 1978 and 1980 give the Court pause. It may well be that in those years, American Appraisal, acting together with U.S. News, intentionally undervalued the magazine's stock to the detriment of the U.S. News employees. And as discussed above, such conduct, not revealed on the face of the appraisal reports, may indeed constitute a self-concealing wrong, so as to toll the statute.

### 2. Common-Law Claims

For the most part, what has been said with regard to the common-law claims brought against the other defendants applies as well to American Appraisal.[23] Those claims, such as that for common-law fraud, predicated upon intentional conduct survive by virtue of the doctrine of equitable tolling as it exists in the District of Columbia.[24] Because no claim for negligence or negligent misrepresentation may be brought against American Appraisal, *see* discussion *infra*, the Court need not reach the issue of whether those claims are time barred.

### Conclusion

The question then arises as to what claims, absent evidence of fraudulent concealment, are barred. For those claims founded upon breach of fiduciary duty,

such as the claims advanced against American Appraisal, ERISA provides for a six-year limitations period, except that a three-year period applies when the plaintiff has actual notice. ERISA § 413, 29 U.S.C. § 1113. Accordingly, since plaintiffs were not on notice of any potential claim against American Appraisal, even though the latter was guilty of no fraudulent concealment, as to any years other than 1978 and 1980, no claim accruing prior to February 28, 1978 may be brought against that defendant under Section 502(a)(3) of ERISA.[25] Since the applicable limitations period for the securities law claims is two years,[26] no such claim may be brought against American Appraisal, except for those accruing in 1978 and 1980. Finally, with respect to the common-law counts, claims may be brought against American Appraisal for fraud, but only with respect to the 1978 and 1980 appraisals.

### PART II

### ARE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECURITIES LAW CLAIMS?

Since their initial February 1984 complaint, plaintiffs have charged U.S. News, the directors and American Appraisal with violations of Section 10(b) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 ("Rule"). They maintain that U.S. News and its directors inten-

---

**23.** The common-law claims advanced against American Appraisal are limited to those for fraud and "constructive" fraud, negligence and negligent misrepresentation.

**24.** Consistent with the Court's discussion of the doctrine of fraudulent concealment as applied to the federal claims brought against American Appraisal, no claim for fraud may be brought against that defendant except as it relates to the 1978 and 1980 appraisals.

**25.** As is obvious, because of ERISA's six-year limitations period, claims under section 502(a)(3) arising out of the 1978 and 1980 appraisals would not be time-barred even absent any fraudulent conduct with regard to those appraisals.

**26.** *See supra* note 5. While the *National Student Marketing* court stressed that the two-year limitations period decided upon in *Forrestal Village, Inc. v. Graham*, 551 F.2d 411 (D.C.Cir.1977), should not be applied retroactively, it is unclear whether the court meant retroactively to claims arising, or to suits filed, prior to 1977. The Court's discussion of the *plaintiffs'* reliance upon a three-year limitations period indicates that the Court probably had the latter meaning in mind. In any event, the question here is academic, given that the only class year that would be effected, 1981, involves a claim that both accrued and was filed after 1977.

tionally and fraudulently depressed the value of the magazine's stock and, through misstatements and omissions in communications with U.S. News employees, concealed material facts underlying that undervaluation. That course of conduct, argue plaintiffs, resulted in significant loss to their interests in both the Profit-Sharing and stock bonus plans. Further, American Appraisal, having allegedly assisted U.S. News in undervaluing the magazine's stock, is charged with aiding and abetting the other defendants in their commission of securities fraud.

In their motions for summary judgment, all defendants contend that plaintiffs' interests in the Profit-Sharing Plan were not "securities" within the meaning of the Act and the Rule. Even if those interests, along with the stock bonus interests, could be termed "securities," defendants maintain that there was no causal nexus between their conduct and plaintiffs' alleged injuries. Finally, American Appraisal insists that it cannot be held liable as an aider and abettor and that, consequently, the securities count must be dismissed as to it.

### A.

### CLAIMS AGAINST U.S. NEWS AND THE DIRECTOR–DEFENDANTS

**1. Application of Securities Law to the Profit-Sharing Plan**

■ Defendants assert, as a threshold matter, that plaintiffs' interests in the Profit-Sharing Plan were not "securities" within the meaning of the Act and the Rule. Section 3(a)(10) of the Act, 15 U.S.C. § 78c(a)(10), defines "security" to include "any ... certificate of interest or participation in any profit-sharing agreement or ... investment contract...." While plain-

tiffs maintain that their former interests in the Plan were "interest[s] ... in [a] profit-sharing agreement," and hence fall squarely within the definitional language of the Act, defendants counter that interests in the Plan can only be characterized as interests in an "investment contract." Even under the latter characterization, argue defendants, plaintiffs' Plan interests failed to qualify as "securities" under the test enunciated by the Supreme Court in *International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).

In *Daniel*, the Supreme Court had occasion to examine the possible coverage under the securities laws of the type of employee profit-sharing plan at issue here. In analyzing the plan presented in *Daniel*, the Court began by noting that a "certificate of interest ... in [a] profit-sharing agreement" is essentially the equivalent of an "investment contract." [27] 439 U.S. at 558 n. 11, 99 S.Ct. at 796 n. 11. *See also Tanuggi v. Grolier, Inc.*, 471 F.Supp. 1209, 1213 n. 5 (S.D.N.Y.1979); SEC Release No. 33–6188, 45 Fed.Reg. 8960, 8963 (1980). And since such a plan is an "investment contract," interest in the plan will be deemed securities only if "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 439 U.S. at 558, 99 S.Ct. at 795 (applying the test of *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946)).

In applying the *Howey* test to the plan at issue there, the Court in *Daniel* found that neither the "investment" nor "expectation of profits" prongs of that test were met. The U.S. News Plan fares no better. To be deemed an investor, one must "cho[ose] to give up a specific consideration in return

---

**27.** Plaintiffs attempt to avoid the force of *Daniel*'s holding that a profit-sharing plan is an "investment contract," by asserting that, whereas the plan at issue in *Daniel* was a pension plan, the U.S. News plan is a "profit-sharing agreement." Not only is plaintiffs' argument tautological, but it is expressly at odds with their assertion elsewhere that the Plan is a "pen-

sion plan" within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2). Moreover there appears to be no basis in fact for accepting the distinction that plaintiffs try to make. Like the U.S. News plan, the *Daniel* plan was funded through employer contributions and vested fully only after a number of years.

for a separable financial interest with the characteristics of a security." 439 U.S. at 559, 99 S.Ct. at 796 (citations omitted). In holding that no such investment had been made in *Daniel*, the Court found that the employees there were "selling [their] labor primarily to obtain a livelihood, not making an investment." *Id.* at 560, 99 S.Ct. at 797. In other words, because the employees received, in return for their labor, an "indivisible compensation package," part of which included pension benefits, they could not be said to have made an investment, for neither did the compensation package as a whole exhibit "the characteristics of a security," nor did the employees' individual decisions "to accept and retain covered employment" have any direct relationship "to perceived possibilities of a future pension." *Id.*

The analysis mandated by *Daniel* compels a similar finding here. The U.S. News employees simply did not "invest" in the Plan when they began service with the Company. Receipt of Plan benefits—as measured by the value of the Plan assets—was merely an incident of employment. Moreover, participants in the Plan could be said to have "chosen" Plan participation only to the extent that they could have forgone receipt of benefits entirely. Such a "choice" lacks the element of voluntariness characteristic of an investment decision. *See* SEC Release No. 33–6188, 45 Fed.Reg. at 8964 & n. 44.

Taking its cue from *Daniel*, the SEC has issued a number of interpretive pronouncements limiting the coverage under the securities laws of employee pension plans. First, no plan in which participation is not voluntary and to which employees do not contribute is covered under the securities laws. SEC Release No. 33–6188, 45 Fed. Reg. at 8961. "[T]he determination of whether a plan is a voluntary, contributory one rests *solely* on whether the participating employees can decide at some point whether or not to contribute their own

funds to the plan." SEC Release No. 33–6281, 46 Fed.Reg. 8446, 8447 (1981). In no way can it be said that plaintiffs contributed to the Plan, much less that any contribution was voluntary.

Even if one were to conclude that plaintiffs somehow "invested" in the Plan, they did not do so with any expectation of profits "derived from the entrepreneurial or managerial efforts of others," as required by *Daniel.* 439 U.S. at 561, 99 S.Ct. at 797. The *Daniel* Court compared the amount of income derived from the investment of the plan assets with the amount represented by employer contributions. *Id.* at 562, 99 S.Ct. at 797. The latter amount ($153 million) was sufficiently larger than the former ($31 million) to support a finding that the success of the plan was largely due, not to the efforts of the plan managers, but to sources of income "over which the plan itself ha[d] no control...." *Id.* Further, enjoyment of plan benefits was dependent upon an "employee's effort to meet the vesting requirements, rather than the fund's investment success." *Id.* To that extent, the participating employee could not be said to have been looking to the plan for a "return" on "some hypothetical investment." *Id.*

An application of the "expectation of profits" prong of the *Daniel* analysis also leads the Court to conclude that plaintiffs' Plan interests were not securities. The health of the Plan was in no wise due to the entrepreneurial skill of its managers. First, the Plan managers were not free to trade the U.S. News stock held by the Plan. Even if they were, any appreciation in the value of the stock would have been due, not to their efforts, but to the success of the Company as a whole. While the Plan did maintain a portfolio of investment securities, income from these—no matter how well managed—was not a great enough factor in the Plan's overall financial health to satisfy *Daniel.*[28] Finally, just as in

---

**28.** From 1975 through 1980, the Plan income that was not dependent upon the efforts of the Plan managers totaled some $8.8 million. Exhibit H of the U.S. News and Individual Defendants, submitted with their reply brief. During that same period, income from the management of the Plan's investment securities amounted to a mere $.36 million, *id.,* evidencing a greater

*Daniel,* a vesting period prevented an employee from obtaining any immediate or direct return on his investment. *See O'Neill v. Marriott Corp.,* 538 F.Supp. 1026, 1031 (D.Md.1982).

To clear up any doubt that the securities laws were not meant to cover a pension or profit-sharing plan such as the one here, the *Daniel* ruling noted that, in enacting ERISA, Congress was filling what it thought to be a regulatory void. 439 U.S. at 569–70, 99 S.Ct. at 801–02. If the securities laws had already extended their coverage to employee benefit plans, the enactment of large portions of ERISA would have been otiose.

**2. Application of Securities Law to the Stock Bonus Plan**

■ It is problematic whether the same analysis that compelled a finding that plaintiffs' interests in the Profit-Sharing Plan were not securities applies as well to their bonus stock holdings.

At least one post-*Daniel* decision casts doubt upon whether interests in any employee stock option plan may be considered securities. *Bauman v. Bish,* 571 F.Supp. 1054, 1064 (N.D.W.Va.1983). *Bauman* however, is not controlling, and this Court declines to follow its reasoning. In examining whether a securities claim could be pressed in connection with an Employee Stock Ownership Plan ("ESOP"), the *Bauman* court found that the plan was more "a method of deferring income" than an arrangement whereby employees invested in employer securities. *Id.* Moreover, because the plan was covered by ERISA, the court felt compelled by the *Daniel* decision to hold that the plan was consequently not covered by the securities laws. *Id.* at 1064–65. The U.S. News stock bonus plan, in contrast, is not an ERISA plan, so that extension to it of coverage under the securities laws would do violence to no Con-

gressional purpose. And to the extent that the U.S. News plan is not designed as "a method of deferring income," it can be argued that the bonus stock was awarded upon "the giving up [of] some tangible and definable consideration," *id.,* within the meaning of the *Howey* test.

More importantly, the *Howey* test was designed to determine whether a particular financial arrangement is an "investment contract" within the meaning of Section 3(a)(10) of the Act, 15 U.S.C. § 78c(a)(10). *Daniel,* 439 U.S. at 558, 99 S.Ct. at 795. It is not argued that the stock bonus plan is an investment contract,[29] and hence invocation of the *Howey* test to preclude a securities claim with respect to that plan is inapposite. What a participant in the stock bonus plan had were voting trust certificates which were redeemable as stock at the termination of the participant's employment, should the magazine decline its option to repurchase the stock represented by the certificates. In that eventuality, the participant would hold a stock certificate, with which he could do as he wished. Looking then at the plain language of the statute,[30] *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975), *cited in Daniel,* 439 U.S. at 558, 99 S.Ct. at 795, it would appear that interests in the U.S. News stock bonus plan represent either "stock" or "voting-trust certificates" within the meaning of the securities laws.

**3. Presence of an "Investment Decision" as to the Resale of Bonus Stock**

■ Even if plaintiffs' bonus stock interests are securities, a claim under the Act or the Rule can only be maintained if some action or inaction on defendants' part influenced the resale of the stock. Simply stated, defendants contend that, because plaintiffs were required, upon retirement, to

disparity between the types of income than that in *Daniel.*

**29.** Consequently, whether the stock bonus plan satisfies the other prongs of the *Howey* test as well is irrelevant.

**30.** *See* Section 3(a)(10) of the Act, 15 U.S.C. § 78c(a)(10) ("'security' means any ... stock ... [or] voting-trust certificate....").

offer their holdings to the magazine, any wrongs that defendants may have committed were either not "material" to or not "in connection with" a sale or purchase of securities within the purview of the securities laws.

Defendants are correct, of course, in stressing that, to survive dismissal, plaintiffs must demonstrate a causal connection between their resale of bonus stock and defendants' allegedly deceptive practices. *Securities and Exchange Commission v. Savoy Industries, Inc.*, 587 F.2d 1149, 1171 (D.C.Cir.1978), *cert. denied sub nom. Zimmerman v. SEC*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 & n. 23 (2d Cir.1984); *Securities and Exchange Commission v. Wall Street Pub. Instit., Inc.*, 591 F.Supp. 1070, 1088 (D.D.C.1984); *Coons v. Kidder, Peabody & Co., Inc.*, 539 F.Supp. 1145, 1147 (S.D.N.Y. 1982). Defendants argue that such a link cannot be demonstrated where a plaintiff employee is required to offer his shares back to his employer, citing *Coons*, 539 F.Supp. at 1148; *Ryan v. J. Walter Thompson Co.*, 322 F.Supp. 307, 313 (S.D. N.Y.), *aff'd*, 453 F.2d 444 (2d Cir.1971) (per curiam), *cert. denied*, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972).

Plaintiffs reply that, even though the magazine had an option to buy back each employee's stock, each employee nevertheless made an "investment decision" in deciding when to retire. Accordingly, they place great reliance upon *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F.2d 532 (3d Cir.), *cert. denied*, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976).

In *Ayres*, the court held that, because he alleged that he would have postponed retirement had he known of certain facts, the plaintiff's case was distinguishable from that of *Ryan*. 538 F.2d at 537. In response, defendants argue that *Ayres* has been widely criticized and maintain that none of the *Foltz* plaintiffs has asserted that he would not have retired when he did had he known of the facts at the basis of the present suit. As to defendants' factual premise, the record is to the contrary. Some plaintiffs were asked, in the course of their respective depositions, only to state why they left the magazine, not whether they would have stayed on if they had known additional facts. Others were asked whether, knowing at the time of their retirement what they know now, they would have altered their plans; at least some responses were in the affirmative.[31]

Defendants' legal premise, that *Ayres* is not good law, is equally dubious. Two cases cited by defendants as criticizing *Ayres* do so without analysis.[32] *Ayres* has, in fact, been cited with approval by a number of courts. *See, e.g., Trecker v. Scag*, 679 F.2d 703, 709 & n. 13 (7th Cir.1982) (plaintiffs, had they known of certain facts, could have sued for redemption of shares under buy-back provision); *Grigsby v. CMI Corp.*, 590 F.Supp. 826, 830–31 (N.D.Cal. 1984). Moreover, as the dissent in *Ayres* notes, the defendant there had an unfettered option to repurchase plaintiff's stock for any reason upon 90-days' notice, not only upon plaintiff's retirement.[33] 538 F.2d

---

**31.** Plaintiff Williamson, when asked whether knowledge of an increase in the value of the U.S. News stock would have affected his retirement plans, stated that he would have "held on" had he known of such an increase. Williamson Deposition, April 24, 1984, at 5–6. Similarly, plaintiff Theobald decided to retire when he did at least in part because he thought his current holdings would provide him enough retirement income. Theobald Deposition at 9–10. Had he thought there was a possibility that his retirement interests had been undervalued, he would have considered postponing retirement. *Id.* at 59–60. Plaintiff Handleman stated that he was advised to retire before the next appraisal and

to take what to his thinking was a good price. Handleman Deposition, April 25, 1984, at 7.

**32.** The cases are *Coons*, 539 F.Supp. at 1148 n. 3 and *Villada v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 460 F.Supp. 1149, 1150 (S.D.N.Y. 1978). The *Coons* court distinguished *Ayres*, however, by noting that the plaintiff in *Ayres* alleged that he would not have retired when he did had he known of certain facts.

**33.** 539 F.Supp. at 1148.

At least one case cited by defendants as critical of *Ayres* noted that, if *Ayres* has limited precedential value, it is because the majority

at 540 (dissenting opinion). In the instant case, U.S. News had no greater option than that focused upon by the majority in *Ayres* —an option to repurchase an employee's stock upon his retirement. While the *Ayres* court may have erred in reaching the conclusion it did based upon the facts before it, which error has occasioned all the criticism, the principle for which *Ayres* stands is still perfectly good law.

Accordingly, this Court holds that a plaintiff, who asserts that he would have deferred retirement pending a hoped-for increase in the value of his stock holdings, makes out a claim under Section 10(b) of the 1934 Act.[34]

### B.

### CLAIMS AGAINST AMERICAN APPRAISAL

Plaintiffs charge American Appraisal with securities law violations by asserting that the company aided and abetted the primary violations committed by U.S. News.[35]

■ There are three elements essential to liability under this theory: (1) commis-

sion by another of a primary violation; (2) scienter, or a "general awareness" on the part of the accused "that his role was part of an overall activity that was improper"; and (3) knowing and substantial assistance in the commission of the primary violation. *Investors Research Corp. v. Securities and Exchange Commission*, 628 F.2d 168, 178 (D.C.Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). The first of these elements has already been considered; plaintiffs have successfully stated a claim against U.S. News for violation of Section 10(b) of the 1934 Act as to the stock bonus plan. Still remaining, then, are questions of scienter and substantial assistance.

The precise contours of plaintiffs' claims against American Appraisal are not as clear as they might be. The other defendants have been variously charged with misrepresenting or failing to disclose (1) the market value of the U.S. News real estate holdings; (2) the use of a minority-interest valuation and marketability discount; (3) the awards of phantom stock; and (4) the plaintiffs' right to seek reappraisal. Even with a generous view of the pleadings, it is

overlooked the fact that Merrill Lynch retained the 90-day repurchase option. *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1053 n. 18 (8th Cir.1977), *cert. denied*, 432 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).

**34.** Plaintiffs also contend that their decision not to seek reappraisal of the U.S. News stock in any year was an investment decision. It is unnecessary to probe further the plausibility of this argument; however, the Court does note that nothing in the record indicates that plaintiffs made a conscious *decision* not to seek reappraisal and that, in advancing such a position, plaintiffs have altered their earlier stance that such a decision was precluded by defendants' actions. *See* Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Injunction at 50.

Finally, plaintiffs contend that, since the securities laws apply equally to purchases or sales of stock, citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 475–76, 97 S.Ct. 1292, 1301–02, 51 L.Ed.2d 480 (1977), U.S. News made an investment decision when it decided (in all cases) to exercise its repurchase option. Defendants quite correctly point out that the issues of "materiality" and causation go to the question of whether the defendants' alleged wrongs induced

action or inaction on the part of a purchaser- or seller-*plaintiff*. In short, plaintiffs "must demonstrate a causal connection between their sales and the alleged deceit." *Coons*, 539 F.Supp. at 1147. It makes no sense to speak of a causal connection between defendants' deceit and their own purchases. Moreover, when the *Santa Fe* Court indicated that the securities laws cover purchases as well as sales, it meant that a *plaintiff* could be either a purchaser or seller, not that a plaintiff could bring an action alleging that a defendant-purchaser had made an "investment decision" induced by its own deceptive practices. *See Santa Fe*, 430 U.S. at 474–77, 97 S.Ct. at 1301–03 (discussing how a defendant's manipulation or deception might affect the investment choices of a plaintiff).

**35.** American Appraisal argues that plaintiffs have not articulated an aiding and abetting claim as to it and that the factual allegations supporting the charge have not met the requirements of Rule 9(b), Fed.R.Civ.P.

While the allegations in the Fourth Amended Complaint may have been questionable, any remaining doubts were cleared by ¶ 50 of the Fifth Amended Complaint.

hard to see how American Appraisal could have aided U.S. News and the director-defendants in such allegedly broad-based schemes to defraud plaintiffs.

In light of the Court's analysis of the statute of limitations issue, it should be clear that the last two charges of misrepresentation and nondisclosure had nothing to do with the work performed by American Appraisal and cannot form the predicate of an aiding and abetting charge. As to the first two, the Court has examined the appraisal reports prepared during the class period and has discovered, contrary to plaintiffs' assertions, that all the improprieties complained of by plaintiffs—if, indeed, any part of American Appraisal's methodology could be said to be improper—were adequately disclosed in the appraisal reports, with the exception of those involving the years 1973 and 1974, when detailed reports were not prepared. The degree to which the information contained in the appraisal reports was further disseminated to the U.S. News employees was simply not American Appraisal's responsibility. And as discussed *infra*, the possibly inadequate disclosure in some years of certain information does not, as a matter of law, amount to the type of fraudulent conduct proscribed by Section 10(b) and Rule 10b–5.

To the extent that it adequately disclosed the information surrounding the appraisal process and real estate valuation, American Appraisal is for the most part immunized from Rule 10b–5 liability. The lower court opinions in *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977),[36] opinions which were not disturbed on review by the Supreme Court, support this conclusion. Both the trial and appellate courts in *Santa Fe* found that the appraiser could not be held liable under the

Rule, since its role was limited to preparing an appraisal report and did not involve any participation in the underlying wrong.[37] 391 F.Supp. 849, 854 (S.D.N.Y.1975); 533 F.2d 1283, 1291–94 (2d Cir.1976). Whether American Appraisal is guilty of wrongdoing in connection with the preparation of any of its reports depends upon what level of scienter will support an aiding and abetting charge.

Where the party charged as an aider and abettor owes the plaintiff a fiduciary duty, the standard of scienter has been held to be one of "recklessness." *Frankel v. Wyllie & Thornhill, Inc.*, 537 F.Supp. 730, 743 (W.D.Va.1982) (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044–45 (7th Cir. 1977); *IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir.1980)). Pointing to the Appraisers' Code of Ethics, plaintiffs urge the court to find that a general fiduciary duty is imposed on appraisers in the performance of their duties. In so doing, plaintiffs seem to be suggesting that the court ignore the prior case law cited *supra*, as well as applicable Department of Labor regulations defining a fiduciary under ERISA.[38] *See* 29 C.F.R. §§ 2509.75–5, 2510.3–21(c)(1)(ii) (1984).

■ Absent a fiduciary duty running from the party to be charged with aiding and abetting and the party so charging, the assistance rendered the primary violator must have been both "substantial" and "knowing." *Investors Research Corp.*, 628 F.2d at 178. *Accord Woodward*, 522 F.2d at 95; *Frankel*, 537 F.Supp. at 744. Undaunted, plaintiffs valiantly attempt to bootstrap into that standard a duty of care premised only upon negligence. Since

---

**36.** In *Santa Fe*, plaintiffs alleged that the price they received as shareholders of a 95% owned subsidiary, upon execution of a short-form merger, was fraudulently depressed.

**37.** American Appraisal also notes that its reports were much more informative than those of the appraiser in *Santa Fe* and that, hence, it fully discharged its duties under the securities laws.

**38.** To the extent that ERISA, and not the securities laws, affords employees superior protection, it seems that ERISA's definition of "fiduciary" should control, even if the securities laws do cover employee benefit plans. *See Daniel*, 439 U.S. at 569–70, 99 S.Ct. at 801–02 (arguing that certain provisions of ERISA make unnecessary the extension to employee benefit plans of the securities laws). *See* discussion of ERISA claims, *infra*.

American Appraisal "knew" that its reports were deficient, the argument runs, it "knowingly" aided and abetted the other defendants in perpetrating their allegedly fraudulent schemes. Regardless of the validity of the premise—that the reports were deficient and that American Appraisal knew as much—the syllogism constructed here by plaintiffs does not support the conclusion reached. "Knowing assistance" means just that: that the party charged (1) has knowingly undertaken certain actions, (2) which it knows will provide (3) assistance to the party committing the primary violation. To hold otherwise would emasculate the standard, *see Investors Research Corp.*, 628 F.2d at 177, by confusing a general awareness of one's actions with purposive conduct. Even if American Appraisal prepared its reports negligently, it cannot be held to have participated in a *fraud* upon retiring employees of U.S. News.

■ Nevertheless, there are two instances in which American Appraisal might be said to have knowingly assisted in a violation of the securities laws. The Court has already observed that, with respect to the 1978 and 1980 year-end appraisals, there are present material issues of fact as to whether that defendant engaged in purposive conduct that would form the predicate of a cause of action sounding in fraud. And since fraudulent conduct forms the kernel of a Rule 10b–5 violation, it follows that plaintiffs should be able to assert at trial an aiding and abetting claim against American Appraisal in connection with reports prepared for those years.

**Conclusion**

For the foregoing reasons, plaintiffs will be able to assert a securities claim against U.S. News and the director-defendants insofar as it relates to undervaluation of plaintiffs' bonus stock holdings. In addition, an aiding and abetting claim properly lies against American Appraisal in connection with the stock bonus plan, but only as it arises out of the 1978 and 1980 year-end appraisals.[39]

## PART III

### ARE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ERISA CLAIMS?

Plaintiffs have asserted claims arising under ERISA against the Profit-Sharing Plan, U.S. News, the director-defendants and American Appraisal. Their claim against the Plan is limited, as it must be, to recovery of benefits due.[40] Against the remaining defendants plaintiffs seek compensatory and punitive damages for what they charge were breaches of fiduciary duty, imposed by ERISA, in connection with the alleged undervaluation of the Company's stock.[41]

In voicing their opposition to plaintiffs' claims, defendants underscore two issues involving the application of ERISA to this litigation. The first presented is whether the stock bonus plan is a "pension plan" within the meaning of ERISA. The second requires a determination as to whether the Supreme Court's recent decision in *Massachusetts Mutual Life Ins. Co. v. Russell*, —— U.S. ——, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), bars plaintiffs' claim for damages under Section 502(a)(3) of ERISA, 29 U.S.C.

---

**39.** In their Fifth Amended Complaint, plaintiffs include a general prayer for punitive damages. Their subsequent responses to interrogatories relative to that complaint reveal that they seek recovery of punitive damages on their securities claims, among others. The 1934 Act does not provide for treble or punitive damages, and expressly limits recovery to "actual damages." *Id.* § 28(a), 15 U.S.C. § 78bb(a).

**40.** The civil enforcement scheme of ERISA, § 502, 29 U.S.C. § 1132, expressly provides for

the recovery of "benefits due ... under the terms of [a] plan," *id.* at § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), but provides for no other relief as against a plan.

**41.** No claim arising under ERISA may be brought by class members who retired before January 1, 1975, the effective date of the Act. Those claims were dismissed by Order of August 23, 1985.

§ 1132(a)(3), for defendants' alleged breaches of fiduciary duty.

In addition, American Appraisal contends that, even if *Russell* does not bar a suit against fiduciaries for damages under § 502(a)(3), it is not a fiduciary within the meaning of ERISA, nor can an action be maintained against it as a non-fiduciary.

## A.

### COVERAGE UNDER ERISA OF THE STOCK BONUS PLAN

■ U.S. News, the director-defendants, and American Appraisal all argue that ERISA offers plaintiffs no relief for alleged wrongs committed in connection with the stock bonus plan, because the Act simply does not cover such plans. In particular, defendants note that the stock bonus plan does not fit within ERISA's definitional framework. The plan quite clearly is not an "employee welfare benefit plan," ERISA § 3(1), 29 U.S.C. § 1002(1), nor does it seem to be an "employee pension plan." Under ERISA, § 3(2), 29 U.S.C. § 1002(2), an "employee pension plan" is defined as one that

> (i) provides retirement income to employees, or (ii) results in a deferral of income by employees extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

The applicable Department of Labor regulations offer further clarification:

> [T]he terms "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, *unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.*

29 C.F.R. § 2510.3–2(c) (1984) (emphasis added).

In support of their argument that the stock bonus plan is covered by ERISA, plaintiffs assert that the U.S. News plan *does* defer the income to its employees and that such deferral is effected by the requirement that the bonus stock be redeemed only upon retirement or separation.[42] In response, defendants argue first that, since the stock awards were made to employees at regular intervals and were based upon services rendered by the employees,[43] they were essentially current compensation and, hence, not the kind of deferred or retirement income contemplated by ERISA. In support of that proposition, defendants cite *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir.1980), a case involving a plan in which employees received discretionary awards of royalties from the employer's oil and gas revenues. In holding that the royalties were not pension benefits, the *Inexco* court stressed that the payments were made annually to the employees as the company received revenues. 611 F.2d at 575. The difference between that plan and the U.S. News plan, of course, is that U.S. News paid its employees in *stock*, redeemable only upon separation. *But cf. Jervis v. Elerding*, 504 F.Supp. 606 (C.D.Cal.1980) (in-kind payments not covered by ERISA).

In arguing that the resale restrictions placed on the bonus stock are not sufficient

---

**42.** Plaintiffs rely upon two Department of Labor Advisory Opinions, both of which indicate that restrictions on the pre-termination resale of stock point towards treatment of stock bonuses as retirement or deferred income. DOL Adv.Op. 79–78A at 1 (Nov. 1, 1979); DOL Adv.Op. 84–46A at 3 (Nov. 19, 1984). Yet in both opinions, the Department merely indicated that *resale restrictions are a necessary, but perhaps not sufficient, condition for ERISA coverage.

**43.** Because the awards were based upon an employee's salary and length of service, the awards seem to be proportionate to services rendered. To that extent, and because they are made periodically, they take on the appearance of compensation rather than deferred or retirement income.

to qualify the plan for ERISA coverage, defendants note that the stock awards were taxable to the employees upon receipt. Hence, they contend the awards could not have been a form of deferred compensation. Whether the tax treatment of the plan is controlling is unclear, but defendants urge the court's reliance upon it in the absence of other controlling precedent.

### Conclusion

From analysis of the authorities advanced by the parties and after consideration of the statutory definitions and regulations, the Court accepts defendants' position that the stock bonus plan is not covered by ERISA.

## B.

## AVAILABILITY OF SECTION 502(a)(3) AS A REMEDY

### 1. Liability of U.S. News and the Director-Defendants

 While not relied upon in their initial and earlier complaints, Section 502(a)(3) of ERISA plays a dominant role in plaintiffs' Fifth Amended Complaint and in their summary judgment memoranda. Not deterred by the ruling in *Russell* that plan beneficiaries cannot recover "extracontractual" damages from fiduciaries under Section 409, 29 U.S.C. § 1109, plaintiffs seize upon the Court's failure to indicate whether the recovery of "extracontractual" damages was similarly barred under Section 502(a)(3). In this connection, the Court's opinion in *Russell* merits fuller discussion.

Essentially, the Court ruled in *Russell* that extracontractual recovery could not be secured because *any* recovery, at least un-

der Section 409(a),[44] necessarily inured to the plan itself, and not to any beneficiaries of the plan. —— U.S. at —— – ——, ——, 105 S.Ct. at 3089–90, 3092. In other words, because a *beneficiary* cannot recover damages for a fiduciary's derelictions under that section, a beneficiary's only remedy, at least in terms of monetary recovery, is provided by Section 502.[45] Moreover, the Court was unwilling to imply a remedy for injured beneficiaries apart from those specifically enumerated in Section 502. —— U.S. at —— – ——, 105 S.Ct. at 3092–94. The Court's rationale for so holding hinges upon a concern for the integrity of ERISA as an "interlocking, interrelated, and interdependent remedial scheme." —— U.S. at ——, 105 S.Ct. at 3093. Yet in discussing the remedies available under Section 502, the Court never expressly refers to Section 502(a)(3). Admittedly, the Court indicated earlier that it was examining respondent's claims only in light of Section 409; however, it was not foreclosed from taking up the issue. Yet in stating that the six remedies enumerated in Section 502 provide the exclusive remedies available to redress wrongs proscribed by the statute, —— U.S. at ——, 105 S.Ct. at 3093, the Court is, by implication, including Section 502(a)(3) among those. The Court simply declined to express a view as to whether relief sought by the respondent might be available under that provision.[46]

Plaintiffs, taking their cue from Justice Brennan's concurrence, —— U.S. at —— – ——, 105 S.Ct. at 3094–99, contend that the provision in Section 502(a)(3) affording "other equitable relief" embraces monetary recovery as well. It is Justice Brennan's position that the "equitable relief" language should be read expansively to incor-

---

**44.** Section 409(a) provides that a breaching fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits [made by] such fiduciary...."

**45.** The Court left open the question whether a *plan* might be able to recover "extracontractual compensatory or punitive damages." 105 S.Ct. at 3092 n. 12.

**46.** Defendants argue that to hold that the Court—for whatever reason—ignored a portion of the statute that would have provided the relief sought would trivialize the opinion, reducing it to an admonition that litigants must plead the proper statutory provision. This is a serious charge. Yet because the Court expressly declined to reach the issue in question, it cannot be assumed that its reservation was tantamount to a holding that Section 502(a)(3) does not afford beneficiaries extracontractual relief.

porate traditional remedies available under trust law, remedies which, he asserts, include the recovery of money damages from a fiduciary.

Defendants reply that the "catchall" provision of Section 502(a)(3) [47] cannot afford plaintiffs relief that would be denied under Section 409(a). The defendants' reasoning is that the Court examined a similar catchall provision in Section 409(a) [48] and found that relief was barred. But they seem to have ignored or have forgotten that the Court held that Section 409 relief necessarily inured to the plan precisely because the catchall language followed immediately upon language stating that recovery was to be had by the plan. Such limiting language is not present in Section 502(a)(3). Consequently, the Court's discussion of Section 409 by itself does not foreclose the possibility of recovery under Section 502(a)(3).

Defendants further contend that the Court's narrow reading of ERISA's remedial provisions is "explicitly at odds" with the concurrence's view, urged by plaintiffs. While it is true that the Court expressed concern lest attempts to "fine-tune" ERISA's enforcement scheme undermine that scheme, it did so in the context of deciding not to *imply* a cause of action for extra-contractual damages under the doctrine of *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Obviously, since Section 502(a)(3) is a part of that scheme, no effort at "fine-tuning" would be involved in holding that that section affords the plaintiffs the relief they seek.

By its very open-endedness, Section 502(a)(3) seems a likely mechanism by which a plan participant could recover damages from a breaching fiduciary. Damages in this context would embrace compensation due a participant for benefits wrongly denied. In other words, as under traditional principles of trust law, a participant could recover benefits that would have been paid him by the plan, but for the wrongful acts of the plan fiduciaries. The recovery, then, is measured by contract, rather than tort, principles. To this extent, it is even less likely that the *Russell* Court meant to deny recovery under Section 502(a)(3) of the kind of damages that plaintiffs *here* seek. Whereas the respondent in *Russell* sought *extracontractual* —tort— damages for the distress caused by petitioner's improper processing of her claim for benefits, plaintiffs in this proceeding seek only damages representing benefits due and unpaid.[49] In *Russell,* the Court held only that a plan participant could not bring a rather unorthodox tort claim against the trustee, not that ERISA swept away the *traditional* remedies afforded a beneficiary as against a trust fiduciary. *See* ― U.S. at ――――, 105 S.Ct. at 3095–97 (Brennan, J., concurring). *See also Central States Pension Fund v. Central Transport, Inc.,* 472 U.S. ――, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985) (ERISA incorporates "the common law of trusts"); *Fink,* 772 F.2d at 958 (citing *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis.1979)); S.Rep. No. 127, 93d Cong., 2d Sess. 35 (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4838, 4865; H.R.Rep. No. 533, 93d Cong., 2d Sess. 17 (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4649 ("The fiduciary responsibility section [of ERISA], in essence, codifies and makes

**47.** Section 502(a)(3) grants a plan participant the right "to obtain ... appropriate equitable relief" to redress violations of the Statute or the plan or to enforce their terms.

**48.** Section 409(a) subjects a breaching fiduciary "to such other equitable or remedial [measures] as the court may deem appropriate, including removal of such fiduciary."

**49.** The *Russell* respondent was paid benefits owed her in full before she brought claim

against the plan trustee. Her claim, then, sounded only in tort.

Similarly, the post-*Russell* cases brought to the Court's attention, *Powell v. C & P Tel. Co. of Virginia,* 780 F.2d 419 (4th Cir. Dec. 18, 1985), *Pokratz v. Jones Dairy Farm,* 771 F.2d 206 (7th Cir.1985) and *Light v. Blue Cross and Blue Shield of Alabama, Inc.,* 616 F.Supp. 558 (S.D. Miss.1985), involved tort claims and, hence, are inapposite.

applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts"); H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5076 (House Conference Report) ("The labor law provisions [of ERISA] apply rules and remedies similar to those under traditional trust law...").

The remedies traditionally afforded beneficiaries by the common law of trusts include the recoupment from a breaching fiduciary of money damages, so that the beneficiary may be made whole. *Restatement (Second) of Trusts* §§ 199(c), 205 (1959); G. Bogert & G. Bogert, *The Law of Trusts and Trustees* § 862 (2d rev'd ed. 1982); III A. Scott, *The Law of Trusts* §§ 199.3, 205 (3d ed. 1967). *See also Brown v. Internat'l Union, United Auto., Aerospace and Agricultural Implement Workers of America (UAW)*, 512 F.Supp. 1337, 1363 (W.D.Mich.1981), *aff'd*, 689 F.2d 69 (6th Cir.1982). Defendants argue that such damages may be recovered only to the extent of a loss to the trust corpus owing to the fiduciaries' dereliction. Here, they assert, there has been no loss: if anything, any undervaluation of the magazine's stock has increased the cash holdings of the Plan by lessening the amount paid out each year in benefits. Yet the effect of an undervaluation would have been to deprive then-retiring Plan participants of a portion of the value due them from the Plan corpus, just as if the Plan fiduciaries had wrongfully sold off some of its assets. That there was no actual diminution in the Plan holdings is immaterial. III A. Scott, *supra*, § 205 at 1666.

### Conclusion

Accordingly, the Court determines that, inasmuch as plaintiffs allege that fiduciary breaches by U.S. News and its directors deprived them of benefits owed under the Plan, they state a valid claim for damages under ERISA § 502(a)(3).

### 2. Liability of American Appraisal

American Appraisal adopts the position that, even if plaintiffs can maintain an action under ERISA § 502(a)(3), they cannot prevail against that defendant, since it is not a fiduciary within the meaning of ERISA. While the Court determines, for reasons to be discussed later, that an action may be maintained against American Appraisal, it is not because that defendant is a fiduciary under ERISA.

The ERISA provides that one is a fiduciary to the extent that it (1) "exercises any discretionary authority or control respecting management or disposition of [plan] assets"; (2) "renders investment advice for a fee or other compensation..."; or (3) "has any discretionary authority or discretionary responsibility in the administration of the plan." *Id.* § 3(21)(A), 29 U.S.C. § 1002(21)(A); *Thornton v. Evans*, 692 F.2d 1064, 1077 (7th Cir.1982).

Certainly, American Appraisal had no authority, discretionary or otherwise, to manage, administer, or to deal with the Plan assets. Nor did its valuation of the U.S. News stock constitute "investment advice," [50] as the Department of Labor's interpretive materials make clear. *See* 29 C.F.R. § 2510.3–21(c)(1)(ii) (1984) ("investment advice" refers to matters such as "investment policy or strategy"); DOL Adv.Op. 76–65 (June 7, 1976) (consultant who values employer securities not a fiduciary). Generally, it has been deemed consonant with ERISA's purpose that "attorneys, accountants, actuaries and consultants performing their usual professional functions ... [are not to] be considered fiduciaries." 29 C.F.R. § 2509.75–5 (1984).

---

**50.** American Appraisal contends that its services cannot be deemed "investment advice," because such advice must be rendered to a plan before one may be considered a fiduciary, 29 C.F.R. § 2510.3–21(c)(1)(i) (1984), and American Appraisal never performed services for the Plan. While plaintiffs conceded in oral argument that American Appraisal did not undertake its duties for the Plan, to the extent that the Plan Committee was a subset of the Board of Directors, it seems rather formalistic to maintain that its services were rendered only to U.S. News and not to its profit-sharing plan.

Those services performed by American Appraisal were certainly no different.

■ Yet, that American Appraisal did not stand in a fiduciary relation to the Plan beneficiaries does not necessarily entail a conclusion that it may not be charged with participation in a breach of fiduciary duty committed by U.S. News and the director-defendants. Traditional principles of trust law, as incorporated by ERISA § 502(a)(3), provide not only for recovery against errant fiduciaries, but also from "non-fiduciaries who knowingly participate, either directly or through an agent, in a breach of trust." *Freund*, 485 F.Supp. at 641–42. American Appraisal asserts, however, that participation is insufficient to assess liability; rather, some wrongful gain must have been secured by the participating non-fiduciary. Since there is not the slightest showing that it acquired any gain, argues American Appraisal, it may not be charged with whatever fiduciary breaches the other defendants may have committed. Yet the receipt of some benefit or advantage from participation in a breach of trust is not a *sine qua non* of non-fiduciary liability. To be sure, some courts have held that participating non-fiduciaries are liable for their actions "at least to the extent [they] profit[ ] from the breach." *McDougall v. Donovan*, 539 F.Supp. 596, 598 (N.D.Ill. 1982); *Donovan v. Daugherty*, 550 F.Supp. 390, 410–11 (S.D.Ala.1982). Because personal gain is most often a concommitant of participation in a breach, most cases dealing with the issue of non-fiduciary liability involve situations in which the non-fiduciary defendant has, in fact, profited. Nevertheless, it is clear from those cases in which the non-fiduciary did not benefit, as well as from the way in which courts have generally stated the rule, that *participation*— not profit—is the predicate for liability. *See, e.g., Thornton*, 692 F.2d at 1078; *Wisconsin Real Estate Inv. Trust v. Weinstein*, 509 F.Supp. 1289, 1300 (E.D.

Wis.1981); *Belcher v. Birmingham Trust Nat'l Bank*, 348 F.Supp. 61, 78 (N.D.Ala. 1968); *LaHue v. Keystone Investment Co.*, 6 Wash.App. 765, 496 P.2d 343, 353 (Wash. Ct.App.1972); *Proctor v. Norris*, 285 Mass. 161, 188 N.E. 625, 626 (Mass.1934). *See also Restatement (Second) of Trusts* § 326 (1959); IV A. Scott, *The Law of Trusts* § 326.5 at 2570–71 (3d ed. 1967); G. Bogert & G. Bogert, *supra*, § 901 at 260. Moreover, the degree of participation required for a finding of liability need not reach the level of purposive conduct necessary to state a claim for assisting in the perpetration of a fraud. *See, e.g., Wisconsin Real Estate Inv. Trust*, 509 F.Supp. at 1299; *Proctor*, 285 Mass. 161, 188 N.E. at 626–27; IV A. Scott, *supra*, § 326.5 at 2570–71.

### Conclusion

■ American Appraisal's alleged conduct thus falls within the boundaries of traditional trust law liability. Accordingly, plaintiffs may advance against American Appraisal claims for damages under ERISA § 502(a)(3) for those class years not outside the limitations period.

### 3. Recovery of Punitive Damages

■ Plaintiffs' general prayer for punitive damages is intended to apply to their claims arising under ERISA.[51] ERISA does not expressly exclude recovery of punitive damages, nor does it expressly provide by its terms for such recovery. The question then becomes whether, inasmuch as ERISA incorporates principles known to the common law of trusts, that incorporation embraces recovery of punitive damages.[52] The Statute's legislative history does not indicate which principles of trust law ERISA was meant to embrace. In the absence of more guidance, it would seem that ERISA incorporates those doctrines of the common law of trusts that are not at

---

**51.** The plaintiffs indicated in their discovery responses that they sought punitive damages on the securities, ERISA, and common-law claims. *See supra* note 39.

**52.** Under traditional principles of trust law, in certain instances a beneficiary may be able to recover punitive damages. G. Bogert & G. Bogert, *supra*, § 862 at 41.

odds with the Act's general enforcement scheme.[53]

■ It is precisely because an award of punitive damages appears to be foreclosed by ERISA's enforcement provisions that the Court deems it the better course to strike the prayer for such relief. The language of Section 502(a)(3) provides for relief to "redress" violations of the Statute. *Id.* § 502(a)(3)(B)(i), 29 U.S.C. § 1132(a)(3)(B)(i). To "redress" a wrong is to make whole and to compensate the victim of that wrong. Punitive damages, on the other hand, are designed to punish and to deter wrongdoing. *International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979). To award punitive damages, then, would go well beyond the scope of ERISA, which, to the extent that it borrows traditional trust law remedies, does so only to *compensate* victims of proscribed activity.[54]

### Conclusion

Accordingly, plaintiffs' prayer for punitive damages on their ERISA claims must be stricken.

### PART IV

### ARE PLAINTIFFS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR ERISA CLAIMS?

As previously noted herein, plaintiffs rely upon ERISA to recover benefits due from both the Profit-Sharing Plan and the stock bonus plan under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). They also seek damages from U.S. News, the director-defendants and American Appraisal charging breaches of fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

Two of these issues have already been resolved against the plaintiffs. It has been determined that the stock bonus plan is not included within ERISA coverage, *supra* at 44–46. It has also been determined that while American Appraisal may be found liable under § 502(a)(3) as a non-fiduciary, *supra* at 53–55, that defendant is certainly not a fiduciary within the meaning of the Act.

In their pending motion for partial summary judgment, plaintiffs present two issues. The first concerns whether plaintiffs received less than the true value of their interests in the Profit-Sharing Plan. In this regard, plaintiffs claim that the U.S. News stock held by the Plan was grossly undervalued through the use of four challenged valuation methodologies: (1) the use of a minority-interest valuation; (2) the application of a marketability discount; (3) an improper reliance upon comparisons with "similar" companies to determine the value of the U.S. News stock; and (4) flawed and superficial consideration of U.S. News' real estate holdings. The second issue concerns plaintiffs' allegation that U.S. News, the director-defendants and American Appraisal breached fiduciary duties imposed by ERISA in conducting and approving the challenged appraisals.

### Applicable Standard of Review

It is primarily the deferential standard of review afforded by ERISA to the decisions of plan trustees that makes it impossible to grant plaintiffs' motion in any part. The standard that seems most appropriate to apply to decisions involving the calculation of benefits would leave untouched any such decision that is not arbitrary or capricious. *See District 17, Dist. 29, Local Union 7113 v. Allied Corp.*, 765 F.2d 412, 416–17 (4th Cir.1985); *Short v. United Mine Workers of America 1950 Pension Trust*, 728 F.2d 528, 533 (D.C.Cir.1984).[55] Yet the review

---

**53.** The recovery of punitive damages, however, is almost never *implied*. *See Dependahl v. Falstaff Brewing Co.*, 653 F.2d 1208, 1216 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

**54.** What *deterence* Congress believed was required is provided in ERISA's criminal enforcement provisions, § 501, 29 U.S.C. § 1131 (crimi-

nal penalties imposed for violations of Part 1 of Subtitle B, §§ 101–110, 29 U.S.C. § 1021–1030).

**55.** These cases, and those cited by defendants, concern the determination of pension eligibility, not the calculation of pension benefits. Nevertheless, it would seem that if a given standard of review applies to a denial of benefits, one no stricter should apply to the mere computation

of a benefits determination may require application of a "stern hand and flinty eye," *Maggard v. O'Connell,* 671 F.2d 568, 572 (D.C.Cir.1982), where circumstances indicate that the individuals who made the determination are under a duty "to preserve the corpus of [a] trust and, accordingly, are naturally disinclined to make awards from it." *Id.* at 571. *See also Smith v. United Mine Workers of America 1950 Pension Trust,* 576 F.Supp. 1419, 1420–21 (D.D.C.1983). And while plan fiduciaries are held to a "prudent man" standard with regard to their management of the plan and its assets, ERISA § 404(a), 29 U.S.C. § 1104(a); *Fink,* 772 F.2d at 955; *Donovan v. Cunningham,* 716 F.2d 1455, 1463–64 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), even that more stringent standard leaves a fiduciary sufficient discretion to render inadvisable reversal of his decision upon summary judgment.

Not only are the factual questions raised by a plan fiduciary's decision not amenable to summary adjudication, but the absence of clear-cut legal standards governing the determination of benefits due leaves the Court without a yardstick by which to gauge the propriety of that determination. What formula should define the level of benefits to be paid is a question left "to the private parties creating the plan." *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). The U.S. News Plan is, in this way, typical: the parties have indeed set out the relevant formula. Article Fifth ¶ e of the U.S. News Articles of Incorporation provides that, if a price per share of the magazine's stock cannot be agreed upon, it must be determined by appraisal. PX 2 at

9. And "[i]n making such appraisal the appraiser shall use methods and standards recognized by the regulations of the United States Internal Revenue Service as appropriate for determining the fair market value of corporate stock." [56] *Id.* at 9–10. Yet these very regulations are markedly open-ended in their requirements—or, rather, suggestions—as to the proper way in which to value the stock of a closely-held corporation such as U.S. News.[57] So, bearing in mind that the "[a]ppraisal of closely-held stock is a very inexact science ...," *Cunningham,* 716 F.2d at 1473, a consideration of the contentions upon which plaintiffs found their present motion is appropriate.

**A.**

**VALUATION METHODOLOGY**

**1. Use of a Minority Interest Valuation**

■ The Treasury Department regulations governing appraisals of the U.S. News stock provide that any formula used to determine plan benefits must be nondiscriminatory, Treas.Reg. § 1.401–1(b)(1)(ii), 29 C.F.R. § 1.401–1(b)(1)(ii) (1985). The regulations also provide that any method used to value plan assets must be "consistently followed and uniformly applied." Rev.Rul. 80–155, 1980–1 C.B. 84, 85. Plaintiffs argue that the valuation of U.S. New's stock on a minority basis was not "consistent and uniform" because employees holding Plan accounts at the time of the magazine's sale in 1984 benefited from the liquidation of a controlling block of stock, whereas those employees who terminated their accounts prior to the sale realized only a minority interest. Yet, as a means

of benefits that will, in fact, be awarded. *See Foltz,* 613 F.Supp. at 639 (post-remand opinion). Moreover, at least one court has applied the arbitrary and capricious standard to the calculation of benefits. *See Korn v. Levine Bros. Iron Works Corp.,* 574 F.Supp. 836, 840–41 (S.D.N.Y. 1983).

**56.** Those regulations, in turn, provide that a qualified plan will lose its preferred tax status if benefits are distributed otherwise than in accordance with the terms of the plan. *See* Treas.

Reg. § 1.401–1(a)(3)(iii), 26 C.F.R. § 1.401–1(a)(3)(iii) (1985).

**57.** The applicable regulations provide only that a plan must "provide *a* definite predetermined formula for ... distributing the fund accumulated under the plan...." Treas.Reg. § 1.401–1(b)(1)(ii), 26 C.F.R. § 1.401–1(b)(1)(ii) (1985) (emphasis added). *See also* Rev.Rul. 80–155, 1980–1 C.B. 84, 85; Rev.Rul. 59–60, 1959–1 C.B. 237, 238.

of determining value, the minority-basis valuation was applied consistently during those years in which it was used. Its utility, if any, was ended, when the magazine was sold.

Leaving aside any question of discrimination, the propriety of using a minority-basis valuation cannot be resolved through a motion for summary judgment.[58] The Internal Revenue Service ("IRS") has noted that, while the control represented by a majority share of stock may justify a higher valuation, such a determination should be based "upon a consideration of all the evidence affecting the fair market value [of the stock]." Rev.Rul. 59–60, 1959–1 C.B. at 242. Plaintiffs rely upon *Estate of Curry v. United States*, 706 F.2d 1424 (7th Cir.1983), for the proposition that a controlling block of stock must always be valued so as to reflect the premium reflected by that control. To be sure, in that case the court did find[59] that a control-basis valuation was appropriate. However, in so holding, the court eliminated the possibility that the majority share held by the decedent's estate would be sold off piecemeal rather than in a single block. *Id.* at 1427–29. Yet the Plan did liquidate minority interests in its assets parcel-by-parcel and, as defend-

ants argue, was designed to do just that. In other words, the Plan could not have been a willing seller of its controlling block of U.S. News stock, because such a sale would have defeated the goal of employee ownership expressed in the magazine's Articles.[60] Even so, as plaintiffs note in their Reply Memorandum, a valuation each year was to be undertaken of the *Plan's* assets, and the value of those assets is arguably not equivalent to the aggregate value of the divisible profit-sharing interests held by each employee. The proof of that contention, however, must await trial and the testimony of witnesses versed in valuation practices.

Plaintiffs in a related case involving U.S. News employees and arising out of much the same series of transactions, *Richardson, et al. v. U.S. News & World Report, Inc., et al.*, 623 F.Supp. 350 (1985), have argued in an "amicus" brief that, contrary to received wisdom, ERISA not only controls the calculation of plan benefits, but also mandates that a control block of stock, held by a plan, must be valued at a premium. The theory advanced in their brief was also adopted without elaboration in the *Foltz* plaintiffs' Reply Memorandum. The

---

**58.** In their second motion for summary judgment, U.S. News and the director-defendants ask the Court to enter summary judgment in their favor with respect to the use of a minority-interest valuation. Because the practice of the appraisal industry is mixed, the argument runs, these defendants could not possibly have acted arbitrarily or capriciously in accepting American Appraisal's minority-basis valuation. Yet summary judgment in favor of defendants would be appropriate only if *all* factors in the record pointed to the reasonableness of accepting that valuation. It is simply impossible at this time for the Court to reach such a conclusion. Accordingly, defendants' motion in this regard is denied.

**59.** It is instructive that the issues raised in *Curry* arose during the course of a jury trial, in which the district court refused to instruct the jury that the decedent's interest in a block of non-voting stock should be valued equally with his interest in a controlling share of voting stock. That decision was reversed on appeal.

**60.** Article Fifth provides:
 In order that the employees of the corporation may be encouraged to maintain the stan-

dards of excellence and initiative which the corporate business requires, and in order to maintain stability and continuity in management and other personnel of the corporation, it is intended that the beneficial ownership of the stock of the corporation shall, to the maximum extent practicable, be held by employees of the corporation or members of their families, directly or through the corporation's profit-sharing trust....

PX 2 at 7. Plaintiffs contend in their Reply Memorandum that an intention to sell or not sell has no bearing on the valuation of a block of stock. The Department of Labor, to which has been delegated the authority to promulgate regulations under ERISA, has taken the contrary position. *See* DOL Adv.Op. 77–78A at 35–36 (Oct. 3, 1977). Even the *Curry* court went on to hold, in connection with another challenged jury instruction, that "[i]t would simply have been legal error to forbid the jury from concluding that the company's full liquidation value may not be realizable due to legal constraints on the power to liquidate." 706 F.2d at 1430–31.

*Richardson* plaintiffs arrive at this position after a cursory look at several of the reporting provisions of the Act. After their review they contend that valuation of the assets held by the U.S. News Plan can only be viewed as a block, the sale of which would bring a premium. The argument and analysis presented is interesting. At this time, however, the Court is not convinced of the merit of their position.[61]

## 2. Use of a Marketability Discount

Plaintiffs question the propriety of discounting the value of the company's stock to reflect the absence of a ready market for that stock. Such a discount was inappropriate, plaintiffs maintain, insofar as the company, by repurchasing each year the bonus stock held by its employees, provided a ready market. Regardless of the merits of this contention, as to the stock bonus plan such an issue cannot be resolved by an appeal to ERISA's mandates, for it has been determined that that plan is not covered by ERISA. The Court notes in passing, however, that U.S. News' practice of repurchasing the bonus shares was taken into account in arriving at the relatively small discount that was applied. *See, e.g.,* PX 17 at 12. As for the propriety of discounting the Plan shares, which were required to be valued equally with the common stock, PX 2 at 7; PX 6 at 13, it should be pointed out that the essential purpose in discounting the magazine's stock as a whole was to render more accurate comparison with the actively-traded stock of similar companies. *See, e.g.,* PX 17 at 11–12. Whether, in the final analysis, this was a wise practice cannot be determined merely from perusing the record.

## 3. Use of Certain Market Comparatives

Plaintiffs challenge the methodology by which the stock of U.S. News was compared to that of similar companies to arrive at an estimate of the former's value. They contend that it was wrong as a matter of law to compare the Company's stock with that of companies whose stock was actively traded on an open market.[62] To the extent that the issue is governed by legal authority at all, plaintiffs' argument is tenuous. The IRS has indicated that, when the stock of comparative companies are used in valuing the stock of a particular closely-held corporation, those companies must be ones having their stock actively traded. Rev. Rul. 59–60, 1959–1 C.B. at 239, 242.

Plaintiffs further take issue with the choice of the particular comparatives used. It goes without saying that such a question is highly inappropriate for summary adjudication.

## 4. Valuation of the U.S. News Real Estate Holdings

Plaintiffs allege that the real estate held by U.S. News was consistently misappraised, in that it was either undervalued or not valued at all. In addition, for those years in which the magazine's excess real estate was valued separately, the amount arrived at was discounted to reflect the impossibility that such value could ever be realized absent majority control.[63]

The charge that the real estate was undervalued is founded largely upon two bases. First, plaintiffs allege that American Appraisal was not kept apprised of the unfolding plans to develop the Company's holdings. Second, what American Appraisal did know about the potential value of the real estate was not properly reflected in its

---

61. The very portion of ERISA relied upon by the *Richardson* plaintiffs makes it clear that the "fair value" of a plan's assets is to be determined "pursuant to the terms of the plan...." *Id.* § 3(26), 29 U.S.C. § 1002(26). And as discussed earlier, the terms of the U.S. News Plan, to the extent that they curb the discretion of an appraiser at all, would seem to favor a minority valuation, or at least a valuation that recognizes the need of the Plan to continue as a viable entity.

62. Plaintiffs argue that such a comparison would necessarily lead to a minority-interest valuation. Yet as noted, whether such a valuation was appropriate is a factual issue that appears at this point to demand resolution at trial.

63. The appraisals are those for the years 1976 (PX 15), 1977 (PX 16), 1979 (PX 19), and 1980 (PX 20).

appraisals. Neither of these issues is readily resolved by summary adjudication. The first involves what are clearly disputed issues of fact, as pointed out in the discussion of the limitations issue, *supra.* The second turns upon what is the proper accounting treatment for as yet unrealized value, a question that must be resolved at trial with the aid of expert testimony.

Similarly, whether it was appropriate to discount any valuation of the real estate to reflect the absence of control is by nature a factual question. It should be noted, however, that it is a somewhat different question from that of whether the Profit-Sharing Plan's stock holdings should have been discounted. The company's real estate, it might be argued, could have been sold off separately at any time, at least to the extent that it was excess to the publication business. The inquiry then becomes whether the Plan, which could have exercised the power to effect this sale, held an asset that ought to have been valued at the premium that could have thus been realized.[64] And that inquiry cannot be undertaken on a motion for summary judgment.

**B.**

**CLAIMS FOR BREACH OF FIDUCIARY DUTY**

 Plaintiffs charge each group of defendants with having breached, in various ways, fiduciary duties owed participants of the Plan. While none of the claims are ripe for summary adjudication, the Court has examined and will discuss each.

**1. Claims Against U.S. News**

Plaintiffs allege that U.S. News breached fiduciary duties owed them by failing to scrutinize the reports submitted by American Appraisal. While "fiduciaries need not become experts in the valuation of closely-held stock ...," *Cunningham,* 716 F.2d at 1474, they are held to a standard grounded in prudence.[65] Yet under the facts of the instant case, the contours of such a prudential standard are best delineated by the fact-finder at trial, not by the court on the basis of conflicting record evidence.

Plaintiffs further allege that U.S. News was remiss in not keeping American Appraisal informed of the magazine's plans for developing its real estate. As should be abundantly clear by now, that charge is replete with disputed issues of fact.

**2. Claims Against American Appraisal**

As discussed previously, American Appraisal is not a fiduciary within the meaning of ERISA. Nevertheless, it may be that American Appraisal is liable for having participated in a breach of trust by U.S.

**64.** Defendants, as one might expect, answer this question in the negative, citing *Cunningham,* 716 F.2d at 1473 n. 38, for the proposition that, contrary to plaintiffs' assertions, a fiduciary who owns a controlling block of stock need not deal with that stock solely in the beneficiaries' interest. What defendants are saying, in essence, is that, even though the Plan could have voted to sell off the excess real estate, it was not obligated to its beneficiaries to exercise that power so as to give them the "benefit of effective control ownership by operation of law." 716 F.2d at 1473 n. 38.

At least two flaws in defendants' argument present themselves. First, it speaks only to whether the Plan participants' interests in the real estate—and not the real estate as a Plan *asset*—were properly valued. Second, the citation to *Cunningham* is inapposite. That case dealt with a situation in which the sole shareholder of a corporation sold a *minority* interest to that corporation's Employee Stock Ownership Plan ("ESOP") at a premium. In finding im-

proper the ascription to the minority interest of a premium because the seller, who retained control, was bound to use that control for the benefit of the ESOP participants, the court noted that because "ERISA contemplates that fiduciaries will sometimes occupy positions giving rise to dual loyalties ...," 716 F.2d at 1473 n. 38, the seller was under *no* obligation to deal with his remaining stock solely for the benefit of the minority stockholders, but could instead enjoy some independence in the use of his own stock. In the instant case, it makes no sense to speak of the Plan as enjoying the benefit of its own stock.

**65.** As noted by this Court on another occasion, "[t]he interlocking membership and close relationship between the Board of Directors and the Plan managers buttress[ ] the conclusion that the determination of benefits made by the Plan should be closely examined." 613 F.Supp. at 641 (post-remand opinion).

News or the director-defendants.[66] Yet the extent of that participation, if any, must be determined at trial.[67]

### 3. Claims Against the Director-Defendants

Plaintiffs claim that, by awarding themselves [68] large blocks of phantom stock, the director-defendants are guilty of self-dealing and, hence, of having breached fiduciary duties [69] owed to the Plan participants. In what manner, exactly, plaintiffs were injured is not at all clear. If the phantom stock awards negatively affected the earnings capacity of the magazine's stock and, hence, depressed the level of benefits paid to plaintiffs, the question becomes whether the accounting treatment of such deferred compensation was reasonable, a question that cannot be resolved on the record. If plaintiffs mean to challenge the acceleration of the awards that took place in 1982,[70] they have no standing to assert a claim, as each of them left the magazine prior to that event. Similarly, plaintiffs have no standing to bring a claim asserting that, as holders of phantom shares, the director-defendants received more than their due of the 1984 sale proceeds. Finally, if the charge is that the phantom stock awards diluted the value of the magazine's

Class A and common stock, by increasing the number of shares over which the appraised value of the Company was divided, the charge is open to serious question. At no time did the shares of phantom stock appear in the denominator of that fraction.[71]

### Conclusion

Because the record contains conflicting evidence as to each of the claims pressed by plaintiffs, and because there is no settled legal authority resolving any issue thus raised, plaintiffs are not entitled to summary judgment as to any claim arising under ERISA.

## PART V

### DOES ERISA PREEMPT PLAINTIFFS' COMMON–LAW CLAIMS?

#### A. As to U.S. News and the Director-Defendants

Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that, subject to certain exceptions not relevant here, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described under [the definitional section]." [72] That preemptive language is to be given broad effect.[73]

---

**66.** *See supra* at 1167–1168.

**67.** If the propriety of American Appraisal's valuation approach presents disputed issues of fact, then whether use of that approach constitutes participation—knowing or inadvertent—in a breach of trust certainly is not a question amenable to summary judgment.

**68.** Defendants maintain that the record shows that only disinterested directors voted on each award. The Court need not pass on that contention at this point.

**69.** Presumably, plaintiffs mean to call into play ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) (prohibiting a fiduciary from dealing with plan assets "in his own interest"). Yet because the phantom stock awards represented liabilities to be paid by U.S. News itself, rather than by the Plan, it is questionable whether a claim of self-dealing with regard to the Plan assets under ERISA—as opposed to one with regard to the magazine's assets as a whole, brought under general corporation law—may be brought against the director-defendants.

**70.** In February and March of that year, four of the director-defendants received accelerated awards of phantom stock, which eliminated their outstanding balances. PX 1.

**71.** *See* 14 at 15; PX 15 at 16; PX 16 at 19; PX 17 at 13; PX 19 at 17; PX 20 at 14. Rather, contained in the denominator were only the 50,000 shares of Class A stock and a varying number (always less than 20,000) of common stock.

**72.** ERISA preempts both statutory and common law to the extent of any conflict. *Id.* § 514(c)(1), 29 U.S.C. § 1144(c)(1) ("The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law....").

**73.** Upon introducing the Conference Report on the floor of the Senate, Sen. Harrison A. Williams, Jr., Chairman of the Senate Committee on Labor and Public Welfare, stated:

It should be stressed that with the narrow exceptions specified in the bill, *the substantive*

*Metropolitan Life Ins. Co. v. Massachusetts,* —— U.S. ——, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985); *Shaw v. Delta-Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983); *Russell v. Mass. Mut. Life Ins. Co.,* 722 F.2d 482, 487–88 (9th Cir.1983), *rev'd on other grounds,* —— U.S. ——, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Yet by its own terms, ERISA preempts state laws only "insofar as they ... *relate to any employee benefit plan.*" *Id.* § 514(a), 29 U.S.C. § 1144(a) (emphasis added). A law "relate[s] to" an employee benefit plan, and hence is subject to preemption, "if it has a connection with or reference to such a plan." *Shaw,* 463 U.S. at 96–97, 103 S.Ct. at 2899–2900.

The precise reach of ERISA's preemption provision depends upon how the phrase "relate to" is to be construed. In holding that ERISA superseded New York's Human Rights Law and Disability Benefits Law, the Supreme Court stressed in *Shaw* that

> Congress used the words "relate to" in § 514(a) in their broad sense. To interpret § 514(a) to preempt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of § 514. It would have been unnecessary to exempt generally applicable state criminal statutes from pre-emption in § 514(b), for example, if § 514(a) applied only to state laws dealing specifically with ERISA plans.
>
> Nor, given the legislative history, can § 514(a) be interpreted to pre-empt only state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like.

*and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law.*

463 U.S. at 98, 103 S.Ct. at 2900. *See also Alessi,* 451 U.S. at 521–26, 101 S.Ct. at 1905–08.

Nevertheless, what triggers preemption—and what preemption doctrine is designed generally to alleviate—is conflict between federal and local law. In the absence of such conflict, preemption simply does not occur. Even when a federal statute is said to "occupy the field," the field must be defined before one can know what is being occupied. It is clear, however, that most of plaintiffs' common-law claims do fall within the boundaries of that field. Because ERISA sets forth its own standards of conduct to which fiduciaries are held *id.* §§ 404, 405, 29 U.S.C. §§ 1104, 1105, the assertion of a common-law claim for breach of the fiduciary duties of care [74] or loyalty would be either unnecessary because wholly congruent with a claim under ERISA § 409, or inappropriate because in conflict with ERISA's fiduciary principles. *See, e.g., Hollenbeck v. Falstaff Brewing Corp.,* 605 F.Supp. 421, 422–29 (E.D.Mo. 1984). For much the same reasons, ERISA has been held to preempt claims for common-law fraud, *District 65, UAW v. Harper & Row, Publishers, Inc.,* 576 F.Supp. 1468, 1487 (S.D.N.Y.1983); *Ogden v. Michigan Bell Telephone Co.,* 571 F.Supp. 520, 522–24 (E.D.Mich.1983); for unjust enrichment and conversion, *District 65,* 576 F.Supp. at 1487; and for negligence [75] in plan administration, *Ziskind v. Retail Clerks Internat'l Ass'n,* 3 E.B.C. 1012, 1014–15 (E.D.Cal.1982). *See also Dependahl v. Falstaff Brewing Co.,* 653 F.2d 1208, 1214–16 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (claim for tortious interference with contract barred). Accordingly, no common-law claim, insofar as it relates to the

120 Cong.Rec. 29928, 29933 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 5177, 5188–89 (emphasis added).

74. In other words, any claim sounding in negligence brought against a plan fiduciary.

75. As discussed, *supra* note 16, plaintiffs' claim for "constructive" fraud, because it merely restates plaintiffs' claims for negligence, is similarly preempted.

Plan,[76] may be brought against U.S. News or the director-defendants.[77]

### B. As to American Appraisal

 Because the fiduciary duties and standard of care established by ERISA do not by their terms apply to one, such as American Appraisal, who is not a fiduciary, it is somewhat harder to say that the statute would preempt a common-law claim for fraud or negligence brought against that defendant. Yet it would certainly yield an anomalous result to hold that a claim for common-law fraud or negligence may be brought against a non-fiduciary, but not against a fiduciary, with the consequence that their respective conduct, though arising out of the same set of transactions, would be governed by different legal standards.[78] Such a situation would pose an obstacle to the accomplishment of Congress' objective of establishing uniform standards of care governing conduct affecting employee benefit plans. *See* ERISA § 2(b), 29 U.S.C. § 1001(b); *Chicago and North Western Trans. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), *cited in Dependahl,* 653 F.2d at 1214–15. Especially because American Appraisal, while not a fiduciary, may be charged with liability under ERISA § 502(a)(3), it would be odd to hold that a similar state-law claim might also be brought against that defendant.[79]

Accordingly, as with those brought against U.S. News and the *director-defendants,* all common-law claims brought against American Appraisal are preempted by ERISA, insofar as they relate to the Plan and have accrued after January 1, 1975. Plaintiffs' claims with respect to the stock bonus plan and to Plan interests liquidated prior to January 1, 1975 are not preempted. However, as discussed *infra,* no claim for negligence or negligent misrepresentation may be maintained against American Appraisal as to either plan with respect to any class year. The remaining claims for fraud are barred by the Statute of Limitations, except as to the 1978 and 1980 year-end appraisals. As a result, plaintiffs' common-law claims as to American Appraisal are reduced to claims for fraud relating to the stock bonus plan, but only as to the 1978 and 1980 appraisals.

### PART VI

### ARE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COMMON–LAW CLAIMS?

In their recent motions and supporting memoranda for summary judgment, U.S. News, the director-defendants and American Appraisal urge this Court to dismiss, on a variety of grounds, the several common-law claims asserted against them. The Court has already considered and ruled

---

**76.** Except, of course, that those plaintiffs who terminated their employment prior to the effective date of ERISA, January 1, 1975, may pursue their common-law claims as to the Plan. As to their interests in the stock bonus plan, of course, plaintiffs' common-law claims are not preempted.

Plaintiffs maintain that, if ERISA does not provide a remedy for given wrong, such as for the negligence of an appraiser, it cannot preempt a remedy otherwise available under state law to redress that wrong. Yet if, as plaintiffs would have it, state law could provide whatever it felt as lacking in federal law, preemption doctrine would have no meaning, for whenever Congress declined to create a certain remedy, state law would step in to fill the gap, regardless of the damage done to the federal statutory scheme as a whole. *See Ovitz v. Jefferies & Co., Inc.,* 574 F.Supp. 488, 491 (N.D.Ill. 1983) (ERISA, through preemption, may limit a plan beneficiary's remedies).

**77.** No common-law claims have been asserted against the Plan as a defendant. *See supra* note 40.

**78.** Even when adopting traditional trust law principles, it was envisioned that federal courts would apply federal common law. *See Russell,* —— U.S. ——–——, 105 S.Ct. at 3097–98 (Brennan, J., concurring) (citing remarks of Senator Javits upon presenting Conference Report, 120 Cong.Rec. 29942 (1974)).

**79.** A closer question would have been whether ERISA would preempt a claim brought against American Appraisal for breach of its contract to supply U.S. News with accurate appraisals, a contract arguably made on behalf of plaintiffs as third-party beneficiaries. Since plaintiffs did not press such a claim, among all those they added to their complaint, the Court is not required to wrestle with the issue.

on several issues pertaining to plaintiffs' common-law claims.[80] The remaining issues to be taken up here are whether an unjust enrichment claim lies as to U.S. News and whether claims for negligence and fraud may be brought against American Appraisal. The Court must also consider whether plaintiffs' prayer for punitive damages on their fraud claims as to all defendants must be stricken.

## A. As to U.S. News—Unjust Enrichment Claim

▇▇ In requesting the Court to dismiss the unjust enrichment claim, U.S. News seems to assume that the claim is predicated on the 1984 sale of the magazine and, consequently, argues that it is nonsensical to assert that a company can be unjustly enriched by its own sale. If that were all the plaintiffs had in mind in formulating this claim, one would be inclined to agree with U.S. News. However, as the Court reads the Fifth Amended Complaint ¶¶ 100–102, plaintiffs allege that, by repurchasing the bonus stock at grossly depressed values, U.S. News has retained a cash surplus that it would not otherwise have. Under that theory, the Court is simply unable to say, as a matter of law, that such a claim cannot lie.

## B. As to American Appraisal—Negligence and Fraud Claims

American Appraisal contends that, since it owed plaintiffs no duty, it is not liable to them for negligence or negligent misrepresentation. In addition, that defendant, in its original motion for summary judgment, urged dismissal of the fraud claim as to it.

### 1. Negligence claim

▇▇ A negligence claim, such as asserted here,[81] will not lie unless American Ap-

praisal owed plaintiffs a duty at the time of the alleged wrong. In cases involving negligent misrepresentation or the breach of a professional standard of care, the duty has been most often found in the contractual relationship existing between the parties. Liability to third parties, even when injury was foreseeable, exists for the most part only when the third party stands in a relation to the defendant that at least borders on the contractual. How the plaintiffs here fit into that doctrinal framework merits fuller discussion.

It is a long-established principle, albeit one subject to constant erosion,[82] that liability for negligent misrepresentation will not lie "in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (1931). *See also National Sav. Bank of the Dist. of Colum. v. Ward*, 100 U.S. (10 Otto) 195, 25 L.Ed. 621 (1880) (attorney not liable to third party for negligent title search). In *Ultramares*, Judge Cardozo held that an accountant could not be held liable to a lender for negligently certifying the balance sheet of a corporate borrower, even when the accountant knew that the balance sheet would be relied upon by lenders and others. In so holding, Judge Cardozo distinguished *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922), in which he held that a weigher, whose services were ordered by a seller on behalf of a buyer, was liable to the buyer for negligently overstating the weight (and hence the price) of a shipment to be accepted by the buyer. Whereas in *Glanzer*, the services rendered on behalf of the buyer constituted the "end and aim of the transaction," *id.*, 233 N.Y. 236, 135 N.E. at 275, the services performed in *Ultramares* were not intended to

---

**80.** The limitations issue was discussed *supra* at 1153–1155, 24–24, the claim for constructive fraud, *supra* note 16; the preemptive effect of ERISA, *supra* at 1174–1176.

**81.** While plaintiffs charge American Appraisal both with negligence and negligent misrepresentation, the Court is able to discern a conceptual difference between the two claims. If American Appraisal was negligent in conducting its ap-

praisals, that negligence could have injured plaintiffs only to the extent that misleading information was conveyed to U.S. News or its employees.

**82.** As Judge Cardozo noted back in 1931, "[t]he assault upon the citadel of privity is proceeding in these days apace." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 445 (1931).

benefit only "incidentally ... the formal promisee." *Id.*, 255 N.Y. 170, 174 N.E. at 445–46.

The District of Columbia courts have by and large adopted the reasoning in *Ultramares* and its progeny. Accordingly, where there is no danger of indeterminate liability, and where a contractual arrangement for the benefit of the plaintiff was entered into by the defendant and a third party, a claim for negligence may be asserted against that defendant. *Needham v. Hamilton*, 459 A.2d 1060, 1063 (D.C. App.1983). *Needham* held that an attorney may be liable to the intended beneficiary of a will that he negligently drafted. In such a case, the liability, if any, naturally runs only to an identified individual or group of individuals, who are the intended and, for the most part, the only beneficiaries of the contractual relationship entered into by the attorney and his client.

Restated somewhat more expansively, the law of the District of Columbia is that a supplier of information may be liable to a third party when he provides information directly to the third party or "indirectly for the benefit of a *specific* third party." *Security Nat'l Bank v. Lish*, 311 A.2d 833, 835 (D.C.App.1973) (citing *Glanzer*) (emphasis added). *See also Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986 (D.C.App. 1980) (report prepared by termite inspector given by real estate agent to plaintiffs). Essentially, the District of Columbia has followed the Restatement of Torts in limiting liability to injury suffered by a "person or one of a limited group of persons for whose benefit and guidance [defendant] intends to supply the information or knows that the recipient intends to supply it." [83] *Restatement (Second) of Torts* § 552(2)(a) (1977).

In this case, of course, plaintiffs do not contend that American Appraisal provided them with information. The question is, then, whether they fall into the second category of persons by whom a cause of action may be maintained. It cannot be seriously argued that American Appraisal intended to benefit plaintiffs by supplying U.S. News with its appraisal reports. However, it may be true that American Appraisal provided U.S. News with the reports knowing that U.S. News intended to benefit plaintiffs. Yet the catch remains that the plaintiff class is not a limited group of people within the meaning of the Restatement. Rather, plaintiffs, as a group, much more closely resemble the class of lenders and investors who the *Ultramares* court held could not be the intended beneficiaries of an accountant's report. The extension of liability to the plaintiff class here would result in the imposition of the same kind of indeterminate liability to an unidentified class [84] from which Judge Cardozo shied away and which the District of Columbia courts are not yet willing to indulge.[85]

Accordingly, no claim for negligence may be asserted against American Appraisal.

### 2. Fraud claim

In both their Fourth and Fifth Amended Complaints, plaintiffs allege that the under-

---

**83.** As Prosser states it,

[The] foreseeability of harm is not the test. The Plaintiff must have been a person for whose use the representation was intended, and it is not enough that the defendant ought reasonably to have foreseen reliance by someone such as the plaintiff. Also if the plaintiff is not an identifiable person for whose benefit the statement was intended, he must at least have been a member of some very small group of persons for whose guidance the representation was made.

Prosser and Keeton, *The Law of Torts* § 107 at 747 (5th ed. 1984).

**84.** At the time each appraisal was prepared, the number and identities of the U.S. News employees who subsequently were to leave the magazine was indeterminable. Accordingly, American Appraisal's liability would also have been indeterminate.

**85.** When a federal court applies state law, it must construe the law as the highest court of that state would. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Steorts v. American Airlines, Inc.*, 647 F.2d 194, 196–97 (D.C.Cir.1981); *Felch v. Air Florida, Inc.*, 562 F.Supp. 383, 385 (D.D.C.1983). Consequently, if the local law of negligent misrepresentation is to be expanded, it must be so expanded by the District of Columbia Court of Appeals.

valuation of the U.S. News stock constituted fraud, an allegation that American Appraisal contends will not survive a motion for summary judgment.[86] American Appraisal is correct, except in connection with the appraisals for 1978 and 1980.

Under District of Columbia law, fraud entails, among other things, the making of "a *deliberate* misstatement of fact . . . with the *intent* to deceive another person." *Shear v. Nat'l Rifle Ass'n of America*, 606 F.2d 1251, 1259 (D.C.Cir.1979) (emphasis added) (citations omitted); *Dresser v. Sunderland Apts. Tenants Ass'n, Inc.*, 465 A.2d 835, 839 (D.C.App.1983). Upon reviewing the entire record developed in this case, the Court has, for the most part, been unable to uncover any material issues of fact that would indicate that American Appraisal *intended* to defraud plaintiffs. However, as noted *supra*, the 1978 and 1980 year-end appraisals stand out as being somewhat suspect.[87] With respect to those—and only those—appraisals, the Court concludes that plaintiffs should be afforded an opportunity to develop at trial a claim for fraud.

### C. As to All Defendants—Punitive Damage Claim

Both U.S. News and American Appraisal contend that plaintiffs' prayer for punitive damages with respect to their common-law claims must be stricken. Those defendants contend that the record is devoid of any evidence of the kind of wrongdoing that merits the imposition of exemplary damages.

The taxing of punitive damages is generally frowned upon in the District of Columbia, except when the defendant's conduct is "willful and outrageous," amounts to "gross fraud," or is "aggravated by 'evil motive, active malice, deliberate violence or oppression.'" *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Systems, Inc.*, 665 F.2d 1066, 1071 (D.C.Cir.1981) (citations omitted); *Boynton v. Lopez*, 473 A.2d 375, 377 (D.C.App.1984). The Court recognizes, along with defendants, that such a burden is a heavy one. However, that burden is one that plaintiffs must carry at *trial*. There is no reason why the Court must now gauge the alleged outrageousness of defendants' conduct; defendants are free to seek a directed verdict on the issue of punitive damages at the appropriate time during the trial.[88]

### Conclusion

In view of the foregoing discussion, plaintiffs may assert a claim for unjust enrichment as to U.S. News, insofar as it relates to their interests in the stock bonus plan, or their interests in the Profit-Sharing

---

**86.** American Appraisal raised this issue in its initial motion for summary judgment, filed July 15, 1985.

**87.** The Court has discussed the allegation that American Appraisal's conduct amounted to fraud in connection with the limitations issue and securities claim. Consistent with those conclusions, the Court is constrained to hold that any fraudulent activity on American Appraisal's part was limited to those appraisals.

**88.** With regard to the 1978 year-end appraisal (and presumably the 1980 appraisal, as well), American Appraisal contends that any wrongdoing was chargeable solely to individual employees of the company, none of whom have been named as defendants, and that consequently punitive damages may not be recovered from American Appraisal as a corporate entity.

Yet as American Appraisal notes, a corporation may be taxed with punitive damages where it has ratified an employee's wrongdoing. *Jor-*

*dan v. Medley*, 711 F.2d 211, 216 (D.C.Cir.1983); *Hammerman v. Peacock*, 607 F.Supp. 911, 919 (D.D.C.1985); *Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 992 (D.C.App.1980); *Franklin Invest. Co., Inc. v. Smith*, 383 A.2d 355, 358–59 (D.C.App.1978); *Restatement (Second) of Torts* § 909(d) (1979); *Restatement (Second) of Agency* § 217C (1958). By submitting reports founded, at least in part, upon the questionable conduct of its employees—conduct of which it was aware—American Appraisal ratified that conduct. In this way, when the 1978 year-end report was submitted with its per share valuation of $105, after responsible officials at the company were aware that the $105 figure was not the result of a studied appraisal, Deposition of John G. Russell, August 20, 1984, at 152, American Appraisal gave its imprimatur to the process by which the final valuation was arrived at.

Plan that were liquidated prior to January 1, 1975.

Against American Appraisal plaintiffs may assert their claims for fraud, but only as they relate to the 1978 and 1980 year-end appraisals.[89] No claim for negligence, however, may be brought against that defendant.

Finally, plaintiffs may continue to seek punitive damages with respect to all their common-law claims, subject of course to contrary disposition during the course of the trial.

An appropriate Order accompanies this Memorandum Opinion.

## ORDER

In accordance with the Memorandum Opinion issued this day, it is this 15th day of January, 1986,

## ORDERED

1. That plaintiffs' motion for partial summary judgment on their claims arising under ERISA is denied;

2. That the motions of U.S. News, the Director-Defendants and the Profit-Sharing Plan for summary judgment with respect to the statutes of limitation are denied;

3. That the motion of American Appraisal Associates for summary judgment with respect to the statutes of limitation is granted as to plaintiffs' claims arising under ERISA, except that a six-year limitations period shall apply, and granted as to any other claims brought by plaintiffs, except those relating to the 1978 and 1980 year-end appraisals.

4. That, as specified below, defendants' motions for summary judgment as to issues other than the statutes of limitations, are granted in part and denied in part:

### MOTIONS OF U.S. NEWS AND THE DIRECTOR-DEFENDANTS

(a) Defendants' motion for summary judgment as to plaintiffs' claims arising under Section 10(b) of the Securities Ex-

change Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission are: (i) granted as to plaintiffs' interests in the Profit-Sharing Plan, (ii) denied as to plaintiffs' interests in the stock bonus plan, and (iii) granted as to plaintiffs' prayer for punitive damages;

(b) Defendants' motions for summary judgment as to plaintiffs' claims arising under Section 502(a)(3) of ERISA are: (i) granted as to plaintiffs' interests in the stock bonus plan, (ii) denied as to plaintiffs' interests in the Profit-Sharing Plan, and (iii) granted as to plaintiffs' prayer for punitive damages;

(c) Defendants' motions for summary judgment are granted as to plaintiffs' claims arising under Section 502(a)(1)(B) of ERISA with respect to the stock bonus plan;

(d) Defendants' motions for summary judgment as to plaintiffs' claims for common-law fraud, constructive fraud, breach of fiduciary duty, unjust enrichment, and negligence are: (i) granted with respect to plaintiffs' claims for constructive fraud, (ii) granted with respect to plaintiffs' interests in the Profit-Sharing Plan that accrued after January 1, 1975, (iii) denied with respect to plaintiffs' interests in the Profit-Sharing Plan that accrued prior to January 1, 1975 and with respect to plaintiffs' interests in the stock bonus plan, (iv) denied with respect to plaintiffs' claims for unjust enrichment, and (v) denied with respect to plaintiffs' prayer for punitive damages.

### MOTION OF AMERICAN APPRAISAL ASSOCIATES

(a) Defendant's motion for summary judgment as to plaintiffs' claims arising under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission is: (i) granted as to plaintiffs' interests in the Profit-Sharing Plan and as to the stock bonus plan except with respect to the 1978 and 1980 year-end appraisals, and (ii) grant-

---

**89.** Such claims may be pressed only in connection with the bonus stock.

ed as to plaintiffs' prayer for punitive damages;

(b) Defendant's motion for summary judgment as to plaintiffs' claims arising under Section 502(a)(3) of ERISA is: (i) granted as to plaintiffs' interests in the stock bonus plan, (ii) denied as to plaintiffs' interests in the Profit-Sharing Plan, and (iii) granted as to plaintiffs' prayer for punitive damages;

(c) Defendant's motion for summary judgment as to plaintiffs' claims for common-law fraud, constructive fraud, negligence and negligent misrepresentation is: (1) granted as to plaintiffs' claims with respect to their interests in the Profit-Sharing Plan that are not barred by the statute of limitations, (ii) granted as to plaintiffs' interests in the stock bonus plan, except as to claims for common-law fraud with respect to the 1978 and 1980 year-end appraisals, and (iii) denied as to plaintiffs' prayer for punitive damages.